ELDON HANNEMAN AND PATRICIA HANNEMAN, HUS-
BAND AND WIFE, APPELLANTS, *v.* ROBERT C.
DOWNER, MAXINE V. SWENSON, AND STODDARD
JACOBSEN, RESPONDENTS.

ROBERT C. DOWNER, CROSS-APPELLANT, *v.* ELDON
HANNEMAN AND PATRICIA HANNEMAN, HUSBAND
AND WIFE, MAXINE V. SWENSON, STODDARD
JACOBSEN, CROSS-RESPONDENTS.

MAXINE V. SWENSON, CROSS-APPELLANT, *v.* ELDON
HANNEMAN AND PATRICIA HANNEMAN, HUSBAND
AND WIFE, ROBERT C. DOWNER, AND STODDARD
JACOBSEN, CROSS-RESPONDENTS.

No. 23434

March 30, 1994                                    871 P.2d 279

*Jack McAuliffe,* Reno for Eldon and Patricia Hanneman.

*Jon M. Yaple,* Carson City, for Robert C. Downer.

*Aebi & McCarthy,* Carson City, for Maxine V. Swenson.

*Allison, MacKenzie, Hartman, Soumbeniotis & Russell* and
*Mike Pavlakis,* Carson City, for Stoddard Jacobsen.

## OPINION

*Per Curiam:*

### FACTS

This action results from a negligently performed survey and subsequent conveyance of the inaccurately described real property. The subject property is part of a tract of land located in the Pinenut Range of Douglas County. Respondent Stoddard Jacobsen acquired the tract in 1950. In 1965, Jacobsen retained respondent Robert Downer to prepare a survey map and record it in the official records of Douglas County. Downer prepared the survey with the understanding that the tract would be subdivided

into several parcels. Prior to commencing the survey, Downer obtained plats, notes, and prior surveys from the Bureau of Land Management ("BLM"). When surveying the property, Downer found and rejected the monuments, accessories, and corners because they did not comport to the field notes of the original survey and because he believed them to be fraudulent.[1] Thus, Downer relied almost exclusively on the calls and distances in the field notes and upon plats in determining the northern boundary of Jacobsen's property.

The property at issue ("the property") is shown on the Downer map as consisting of 5.88 acres; it is one of the parcels created by Jacobsen's subdivision. In late 1966 or early 1967, Jacobsen conveyed the property to Frank Frazier, a well driller, in exchange for services rendered by Frazier. However, the conveyance from Jacobsen to Frazier was never officially memorialized because Frazier was illiterate. In 1971, Frazier sold the property to respondent Maxine Swenson for $9,500.00. At Frazier's request, Jacobsen deeded the property directly to Swenson by a grant, bargain and sale deed.

In 1976, Swenson sold the property to the appellants, Eldon and Patricia Hanneman, for $35,000.00.[2] The Hannemans gave Swenson $7,500.00 and executed a promissory note for $27,500.00, to be paid in monthly installments of $200.00. Both Swenson and the Hannemans believed that the property consisted of 5.88 acres, upon which was situated a dilapidated and uninhabitable house. The well on the property was inoperative, the water pipes were broken, the access road was nearly inaccessible, the flat roof on the old house leaked, and the kitchen and bathroom were in shambles.

Hanneman, a carpenter by trade, repaired the well, water pipes, and road, constructed a gable roof, installed custom-built

---

[1] A "corner" is a point determined by the surveying process, which sets or establishes the boundaries of a subdivision. A "monument" is a physical object that marks the corner point. Types of monuments include a marked wooden stake or post, a marked stone, an iron post with an inscribed cap, a marked tree, or a rock with an "X" at the exact corner point. "Accessories" are part of corner monuments and consist of bearing trees or objects, mounds of stone and pits dug in the sod or soil, that aid in identifying the corner position. *Bureau of Land Management, U.S. Dep't of Interior, Technical Bulletin 6, Manual of Instructions for the Survey of the Public Lands of the United States,* Ch. V, § 5-4, p. 129. "Field notes" are the written record of the survey that "identifies and describes the lines and corners of the survey and the procedures by which they were established." *Id.* at Ch. VIII, § 8.1, p. 183.

[2] The Hannemans were divorced in 1976 and unless otherwise stated, "Hanneman" refers to Eldon Hanneman.

kitchen cabinets, and made sundry repairs to the kitchen and bathroom. He also installed new siding, two windows, a sliding window door, a wood stove, light fixtures, and a concrete patio.

In 1981, Hanneman learned that a private survey performed by Veta Grande Mines revealed that over four acres of the property (including the house and well) belonged to the federal government. Hanneman contacted Swenson and informed her of the defective survey performed by Downer. Swenson defended Downer's survey but rejected Hanneman's offer to continue paying for the property on condition that Swenson agree to reimburse him if Downer's survey proved to be incorrect. Hanneman stopped making payments in April of 1982.[3] At that time, the unpaid balance on the note held by Swenson was $26,019.48. Shortly thereafter, the BLM confirmed the accuracy of the Veta Grande survey. Ultimately, the Interior Board of Land Appeals ("IBLA") affirmed the accuracy of both the Veta Grande Mines survey and BLM resurvey.

Hanneman continued to occupy the premises on a sporadic basis until the autumn of 1985, when he abandoned the property entirely. In a effort to mitigate his damages, Hanneman removed the kitchen cabinets, bathroom vanity, light fixtures, wood stove, washer and dryer, and other items of personal property. In leaving the premises, Hanneman made no provision for protecting the property against vandalism or the elements. During trial, Odd Kjell "Kelly" Larson, a carpenter called by Swenson, testified that it would cost over $12,000.00 to repair the damage caused by Hanneman's mitigation. Swenson eventually foreclosed upon the property and now owns the remaining 1.5 acres, which are narrow, steep, and valued at $1,000.00.

The Hannemans filed the underlying action on July 31, 1984, in which they asserted claims against Swenson for misrepresentation, breach of the sales agreement, and breach of warranty of title. The Hannemans also complained against Jacobsen for negligence and breach of warranty of title, and alleged negligence against Downer. The action sought $120,000.00 in damages, consisting of the market value of the property on the date of the complaint, and attorney's fees.

Swenson counterclaimed against the Hannemans for breach of the promissory note. Swenson also filed cross-claims against Jacobsen and Downer seeking indemnification for breach of warranty of title and a negligent property survey, respectively. Finally, Jacobsen cross-claimed against Downer for indemnification based upon the negligent survey.

---

[3]Hanneman initially deposited the monthly payments into a bank account; however, Hanneman withdrew the funds in 1988 and used them to purchase his current residence.

At the close of the Hannemans' case-in-chief, Jacobsen moved for an NRCP 41(b) dismissal on grounds that: (1) no privity existed between the Hannemans and Jacobsen or between Swenson and Jacobsen to support a breach of warranty of title claim; (2) Hannemans had failed to present evidence of Jacobsen's negligence; and (3) Jacobsen was not liable for Downer's negligence, if any, because Downer was an independent contractor. The district court granted the motion and dismissed Jacobsen from the case.

At the conclusion of the bench trial, the district court found that Swenson had contracted to sell the Hannemans 5.88 acres, and that Swenson's "inability to convey 5.88 acres was a breach of that contract due to a failure of consideration." Accordingly, the district court ordered Swenson to pay the Hannemans' out-of-pocket costs of $7,500.00. Swenson's liability to the Hannemans, however, was offset by her judgment against Downer for $7,500.00, with interest, which the district court specifically designated as the amount of "Swenson's liability to the Hannemans." The court found that Downer negligently performed the survey and ordered him to pay Swenson the unpaid balance of the promissory note from the Hannemans ($26,019.48 minus the $1,000 value of the remaining land). Finally, the district court ordered Downer to pay attorney's fees to the Hannemans and to Swenson in the amount of $10,000.00 each, together with taxable costs.

## DISCUSSION

The parties have raised several issues on appeal, only the following of which need resolution. The Hannemans impute error to the district court's calculation of damages and its decision to dismiss Jacobsen from the action. Swenson contends on cross-appeal that the court erred when it awarded damages to the Hannemans and failed to award Swenson damages for breach of contract. Finally, Downer insists that the district court erred in finding that he negligently performed the property survey and that his liability extends to subsequent purchasers of the affected property.

### 1. The Hannemans' damages

Under the peculiar facts of this case, where Swenson purported to sell land which she mistakenly thought she owned, the district court correctly determined that the measure of the Hannemans' damages would be the amount of their "out-of-pocket" loss. However, damages are awarded to make the aggrieved party

whole, and the district court's award, although pursuant to the correct standard, did not adequately reflect the "out-of-pocket" loss sustained by the Hannemans. *See* Hornwood v. Smith's Food King No. 1, 107 Nev. 80, 84, 807 P.2d 208, 211 (1991). "Out-of-pocket" damages are measured by the difference between the amount paid by the aggrieved party and the actual value of that which was received. Randono v. Turk, 86 Nev. 123, 130, 466 P.2d 218, 223 (1970).

The Hannemans were dispossessed of property concerning which they had expended approximately $53,000.00.[4] Nevertheless, the district court limited the Hannemans' damages to $7,500.00 based upon findings that the Hannemans had "failed to mitigate their damages" when they abandoned the property, and that the monthly mortgage payments were "completely offset by the reasonable rental value they received in occupying the property."

As a general rule, a party cannot recover damages for losses that a reasonable effort could have avoided. Conner v. Southern Nevada Paving, 103 Nev. 353, 355, 741 P.2d 800, 801 (1987). Our review of the record compels us to conclude that the district court clearly erred in finding that the Hannemans did not make a reasonable effort to mitigate their losses. The Hannemans removed virtually every item of value they had placed on the property that was reasonably removable, and deducted the value thereof from their damages. As a result, the damages were mitigated by approximately $8,000.00. Given the circumstances of this case, the Hannemans could have done little else by way of mitigation.

Moreover, the district court's reliance upon Mr. Kjell's testimony was misplaced. The cost of restoring the house after the removal of items by the Hannemans represented an irrelevant consideration by Swenson since she had no ownership interest in the house from which the salvaged items had been taken. Hanneman's mitigative actions were beneficial to Swenson, and thus could not serve to further reduce Swenson's liability to the Hannemans.

---

[4] In addition to the $7,500.00 down payment, the Hannemans paid Swenson $200.00 per month for approximately seven years, paid all taxes and insurance on the property for approximately eleven years, and purchased approximately $15,000.00 of building materials. Moreover, the Hannemans spent in excess of 2,000 hours improving the property. Hanneman conservatively valued his time at $10.00 per hour (he was then making between $15.00 and $18.00 per hour as a carpenter).

Ordinarily, a fair rental value of the property would be a proper offset against payments ineffectually applied to the purchase price of the property during its occupancy by the putative purchaser. In this instance, however, we have determined that such an offset is unwarranted. The Hannemans agreed to purchase property that included a house that was uninhabitable. They lived and worked on the property under conditions that were substantially less than desirable. The Hannemans not only made the road to the property usable, they worked in excess of 2,000 hours in an effort to restore the premises to a habitable condition.

Although we have concluded that the Hannemans must receive as damages, an award for the time and materials expended on the property, they will not be compensated for the period of time they had to endure living conditions that would not have induced them onto the property as renters. As buyers, they executed and made payments under a promissory note that was to result in their eventual ownership of 5.88 acres. The Hannemans relied upon their contract with Swenson and invested approximately $53,000.00 into what they thought would be their permanent home. There is no evidence in the record that would support the proposition that the Hannemans, as temporary renters, would have invested the same amount of time and money in the delapidated and uninhabitable house at issue. Swenson's breach of the contract to convey 5.88 acres deprived the Hannemans of the opportunity to purchase and make habitable a home in which they could build an equity and enjoy the pride of ownership. Thus, we conclude that the district court clearly erred when it calculated the amount of the Hannemans' "out-of-pocket" damages. Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 591-92 (1990). The Hannemans are entitled to the total amount of their investment, less the amount of their mitigation, together with interest from July 22, 1976. Therefore, we affirm Swenson's liability to the Hannemans, but direct the district court, upon remand, to recalculate the actual "out-of-pocket" damages suffered by the Hannemans. The amount of Swenson's $7,500.00 judgment against Downer must also be increased accordingly.

## 2. *The court's decision to dismiss Jacobsen*

The Hannemans also contend that the district court erred in dismissing their action against Jacobsen. The contention is based upon Jacobsen's alleged vicarious liability for Downer's negligent survey under the doctrine of *respondeat superior.* However,

the doctrine does not apply where, as here, there is no relationship of "superior and subordinate, or, as it is generally expressed, of master and servant, in which the latter is subject to the control of the former. The responsibility is placed where the power exists." Wells, Inc. v. Shoemake, 64 Nev. 57, 64, 177 P.2d 451, 455 (1947).

Downer was an independent contractor over whom Jacobsen exercised no control. Moreover, the precision and expertise with which surveyors must perform their work does not lend itself to control by laypersons. As one author noted:

> The surveyor is isolated in his calling and therein lies his responsibility . . . . Dishonesty in ordinary business life cannot long be hid and errors in accounts quickly come to light, but the false or faulty survey may pass unchallenged through the years, for few but a surveyor himself are qualified to judge it.

Walter G. Robillard and Lane J. Bouman, *Clark on Surveying and Boundaries* § 2.04, p. 30 (6th ed. 1992) (quoting A.C. Mulford, *Boundaries and Landmarks* 88, 89 (1912)). Additionally, NRS 625.330(3) makes it unlawful for a surveyor to sign, stamp or seal any plat, map, report or document relating to land surveying which the surveyor himself did not prepare or for which he did not have "responsible charge of the work."

For the reasons stated above, we affirm the district court's finding that Downer acted as an independent contractor whose negligence cannot be imputed to Jacobsen. The action against Jacobsen was properly dismissed by the district court.

### 3. *The doctrine of merger*

Swenson challenges the district court's finding that her failure to convey 5.88 acres of land to the Hannemans was a breach of contract. Swenson argues that no legal or factual bases exist to support the court's finding because no written contract for the sale of real property was introduced at trial. Swenson cites NRS 111.210, the statute of frauds respecting real property, to support her argument. That section provides in relevant part:

> 1. Every contract . . . for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, be in writing, and be subscribed by the party by whom the lease or sale is to be made.

NRS 111.210(1).

Swenson's reliance upon the foregoing statute is misplaced. The statute of frauds does not require the existence of a formal written contract to validate a land sale transaction as long as some "note or memorandum" memorializing the transaction exists. *See* Ray Motor Lodge v. Shatz, 80 Nev. 114, 119, 390 P.2d 42, 44 (1964) (stating that separate writings considered together may satisfy statute of frauds even if neither is a sufficient memorandum in itself).

In the instant case, the district court concluded that the property description in the sales listing, "together with the surrounding circumstances of the land sale transaction, created a contract for the sale of 5.88 acres." The legal description contained in the grant, bargain and sale deed refers to the Record of Survey which Downer filed in 1966 and which shows Parcel H (the subject parcel) as consisting of 5.88 acres. Additionally, the promissory note between Swenson and the Hannemans corroborates the sale of 5.88 acres. These writings, when considered together, satisfy the statute of frauds and evidence a contract for the sale of the subject property.

Swenson further argues that even if a contract did exist, its terms merged into the deed as a matter of law. She contends, therefore, that under the doctrine of merger, any obligations she owed to the Hannemans derived solely from the deed. Since the property was conveyed to the Hannemans by grant, bargain and sale deed, Swenson claims to have warranted only that she had not conveyed the same real property to another and that the property was free from encumbrances.[5] Swenson also insists that if, after delivery and acceptance of a deed containing no express or implied warranties, the title proves defective, a buyer generally has no remedy for failure of consideration unless elements of fraud or rescission are present. Swenson claims that there was no showing that she breached the special warranties contained in the

---

[5]NRS 111.170 states, in relevant part:

1. The words "grant, bargain and sell" in all conveyances made after December 2, 1861, in and by which any estate of inheritance or fee simple is to be passed, shall, unless restrained by express terms contained in such conveyances, be construed to be the following express covenants, and none other, on the part of the grantor, for himself and his heirs to the grantee, his heirs, and assigns:

(a) That previous to the time of the execution of the conveyance the grantor has not conveyed the same real property, or any right, title, or interest therein, to any person other than the grantee.

(b) That the real property is, at the time of the execution of the conveyance, free from encumbrances, done, made or suffered by the grantor, or any person claiming under him.

grant, bargain and sale deed, and that the Hannemans failed to plead either fraud or rescission in any event.

Swenson's argument is overly simplistic and fails to take into account the exceptions to which the doctrine of merger by deed is subject. The merger by deed doctrine has been described as follows:

> The general rule concerning a contract made to convey the property is that once a deed has been executed and delivered, the contract becomes merged into the deed, because it has accomplished the purpose for which it was created. The terms in the deed which follows the contract of sale become the sole memorial of the agreement which was once contained in the contract of sale. *This does not mean that a contract no longer exists, just that the deed controls as the contract,* rather than the terms of the prior sales contract.

Clark v. Cypress Shores Develop. Co., 516 So.2d 622, 626 (Ala. 1987) (citations omitted; emphasis added). Stated differently, when the terms of the deed cover the same subject matter as the earlier contract and the two are at variance, the deed controls. Dobrusky v. Isbell, 740 P.2d 1325, 1326 (Utah 1987). Whether merger is applicable "depends upon the intention of the parties, and intention in such cases is a question of fact to be determined by an examination of the instruments and from the facts and circumstances surrounding their execution." Webb v. Graham, 510 P.2d 1195, 1197 (Kan. 1973); *see also* Szabo v. Superior Court, 148 Cal.Rptr. 837, 840 (Cal.Ct.App. 1978) ("courts have looked to the intention of the parties to determine whether or not the deed was intended as the complete and final embodiment of the agreement"); Kartheiser v. Hawkins, 98 Nev. 237, 239, 645 P.2d 967, 968 (1982) (stating that parties' intentions are determined from all the circumstances surrounding the transaction).

Consonant with the foregoing authorities, Swenson's attempt to avoid her contractual obligations to the Hannemans by resort to the doctrine of merger by deed is without merit for several reasons. First, although a grant, bargain and sale deed contains only two express warranties, the Swenson deed expressly conveyed to the Hannemans the land "shown on Parcel 'H' on that certain Record of Survey recorded November 25, 1966, as File No. 34665, Official Records of Douglas County, Nevada." As indicated previously, the Record of Survey shows that Parcel "H" contains 5.88 acres. Second, the terms of the deed and contract are not at variance. The deed and the documents that compose the contract all purport to convey 5.88 acres to the Hannemans. Finally, the record reflects that the Hannemans

expected to receive, and Swenson intended to convey, 5.88 acres of land, upon which was situated a "fixer-upper" house. Indeed, Swenson admitted that she believed she was selling the Hannemans 5.88 acres and that no one would have paid $35,000.00 for only 1.5 acres.

For the reasons noted above, we conclude that the district court correctly determined that Swenson breached her agreement to convey 5.88 acres to the Hannemans.

### 4. Downer's negligence

Downer contends that his actions did not fall below the standard of care for licensed surveyors because he made the proper assumptions when reaching his conclusions concerning the location of the northern boundary of Jacobsen's property. In particular, Downer claims that field notes are presumptively correct until rebutted by a preponderance of the evidence and, therefore, he was required to assume that the calls and distances contained in the field notes were accurately measured and recorded. In contrast, the district court heard expert testimony that Downer was not entitled to rely upon the calls and distances in the field notes once he located the monuments and, if he could not locate a monument, he was required to reset the monument by a double proportionate measurement.

We conclude that substantial evidence supports the district court's determination that Downer failed to meet the requisite standard of care. In addition to the cumulative evidence presented at trial, we have previously recognized that the location of monuments prevails over calls and distances:

> The trial court thus fully recognized, as a matter of law, that the original monument evidencing the corner common to sections 16, 17, 20 and 21, if found and identified (or, if destroyed or obliterated, if its location could be fixed), would control the situation irrespective of the field notes and, undoubtedly, irrespective of the testimony of the defendants' witnesses hereinafter referred to.

Backer v. Gowen, 73 Nev. 34, 39, 307 P.2d 765, 768 (1957).[6]

Moreover, the district court expressly disbelieved Downer's testimony and relied instead upon the testimony of Neil Forsythe,

---

[6]We also noted in *Backer* that the trial court's conclusion was supported by the *U.S. Department of Interior, Bureau of Land Management, Manual of Survey Instructions* § 354 (1947), which provided the controlling methodology for Downer's survey.

a cadastral surveyor for the BLM, who indicated that the standard of care requires a surveyor to establish the four corners of a given section by identifying the location of the original survey monuments. Downer contends that Forsythe was not qualfied to render an opinion as to the standard of care because he is not a licensed surveyor in Nevada. Downer's contention lacks merit for two reasons: First, a person need not be licensed to qualify as an expert; rather, the witness must simply possess "special knowledge, skill, experience, training or education" relating to the subject matter. NRS 50.275. Forsythe, a BLM surveyor for over thirty-five years, was qualified to testify on the subject of surveying methods. Second, employees of the federal government who have been authorized under federal law to conduct surveys need not be licensed unless they are performing private surveys within the state. NRS 625.490(4).[7]

The district court is better suited to rule on the qualifications of persons presented as expert witnesses and we will not substitute our evaluation of a witness's credentials for that of the district court absent a showing of clear error. The district court did not err in allowing Forsythe to testify as an expert.

### 5. *Downer's duty to subsequent purchasers*

Downer contends that he owed no duty to subsequent purchasers of the subject property. We disagree. Surveyors may be held liable for the damages that result from their mistakes, misrepresentations, or negligence. *See generally* Dag E. Ytreberg, Annotation, *Surveyor's Liability for Mistake in, or Misrepresentation as to Accuracy of, Survey of Real Property,* 35 A.L.R.3d 504 (1971). Lack of contractual privity between the parties is not a defense in an action for tortious negligence. Long v. Flaningan Warehouse Co., 79 Nev. 241, 245, 382 P.2d 399, 402 (1963) (the absence of contractual privity is not a defense to

---

[7]NRS 625.490(4) provides:

    1. Any state, county, city or district employee directly responsible to a professional land surveyor.

    2. Any subordinate to a professional land surveyor of this state, insofar as he acts as a subordinate.

    3. Registered professional mining engineers engaged solely in surveys made for mining and milling purposes or facilities pertaining thereto.

    4. Officers and employees of the United States Government who have qualified under federal regulations and have been authorized to make surveys for the government, but such a governmental employee shall not engage in private practice as a land surveyor in Nevada unless he is registered under this chapter.

tort liability). A surveyor's duty has been held to extend to subsequent purchasers who relied upon the survey to their detriment. Rosney v. Marnul, 250 N.E.2d 656 (Ill. 1969); Cook Consultants, Inc. v. Larson, 700 S.W.2d 231 (Tex.Ct.App. 1985). Downer fully understood that his survey would affect future purchasers of the divided Jacobsen tract.

We conclude, consistent with the authorities cited above, that Downer indeed had a duty to the Hannemans as foreseeable subsequent purchasers of the property, and that Downer breached that duty, thereby causing damage to the Hannemans. Unfortunately, the district court properly found that Downer's negligence was the actual and legal cause of the Hannemans' damages, yet inexplicably assessed damages only against Swenson. This was error. Upon remand, the district court shall enter judgment for the amount of Hannemans' recalculated damages against both Swenson and Downer, jointly and severally. Of course, the modified judgment must again provide that Swenson may recover over against Downer any and all sums the Hannemans recover from Swenson.

Finally, Downer invokes the statute of limitations as a bar to the Hannemans' claims against him. Downer's references to NRS 11.203, 11.204, and 11.205 are misplaced. These three statutes all apply to actions related to an aspect of construction that eventuates in damage to the plaintiff. Our legislature has not enacted a specific period of limitations for surveyors, and therefore the "catch-all" statute, NRS 11.220, applies.[8] The Hanne-

---

[8]NRS 11.220 entitled "Actions for relief not otherwise provided for" provides: "An action for relief, not hereinbefore provided for, must be commenced within 4 years after the cause of action shall have accrued."

In Woods v. Lable Investment Corp., 107 Nev. 419, 812 P.2d 1293 (1991), the parties were involved in a boundary problem that resulted in an encroachment on an adjacent lot. Although a surveyor was not sued, in the course of the decision we stated that NRS 11.190 provides a six-year limitation period for contract actions and a two-year limitation on tort actions." The reference to a two-year period of limitation for tort actions was overbroad, as 11.190(4)(d) (the two-year provision) applies only to personal injury and wrongful death actions. NRS 11.190(3)(d) provides a three-year period of limitation for fraud which, of course, is a tort. Moreover, we have expressly held that NRS 11.220 (the so-called "catch-all" statute) "is the applicable statute for suits concerning tortious damage to real property." Oak Grove Inv. v. Bell & Gossett Co., 99 Nev. 616, 621, 668 P.2d 1075, 1078 (1983). To the extent that our statement in *Woods* may be construed to apply to tort actions other than those for personal injury or wrongful death, it is hereby disapproved. Tort actions, such as the instant action, that are not expressly addressed by a specific statute of limitations are subject to the four-year period of limitations provided under NRS 11.220, the catch-all statute.

mans were placed on notice that they may have had a cause of action against Downer in 1981. The complaint against Downer was filed by the Hannemans in 1984, well within the four-year period of limitations specified under NRS 11.220. Therefore, Downer's attempt to avoid liability based upon the expiration of the period of limitations is meritless.

We have reviewed the remaining issues not heretofore discussed and have determined that they are without merit and need not be addressed.

## CONCLUSION

For reasons discussed above, we reverse the inadequate award of damages to the Hannemans, and remand to the district court with instructions to recalculate and increase the damage award to the Hannemans consistent with the views expressed in this opinion. The district court is also directed to enter judgment against Downer for the full amount of Hannemans' damages so that Swenson and Downer are jointly and severally liable for Hannemans' total damages. The district court shall also provide judgment in favor of Swenson against Downer for any and all sums that the Hannemans may recover against Swenson in satisfaction or partial satisfaction of their judgment. The judgement entered below is affirmed in all other respects.