YAMAHA MOTOR COMPANY, U.S.A., Appellant, *v.* BETH ARNOULT, Respondent.

No. 27649

February 26, 1998                    955 P.2d 661

*Pico & Mitchell* and *James R. Rosenberger*, Las Vegas; *Wilson, Elser, Moskowitz, Edelman & Dicker*, and *James P. Donovan*, New York, New York, for Appellant.

*Donald J. Campbell* and *J. Colby Williams*, Las Vegas; *Unglesby & Koch*, and *Stephen R. Edwards*, Baton Rouge, Louisiana, for Respondent.

## OPINION

*Per Curiam:*

After sustaining catastrophic injuries while operating a Yamaha four-wheel all-terrain vehicle, Beth Arnoult filed suit against

Yamaha Motor Company, U.S.A., on theories of strict products liability and negligence. The trial jury awarded Arnoult $3,600,000 in damages, and the district court awarded attorney's fees under NRCP 68. Yamaha appeals.

We affirm the judgment with the exception of one component of the damage award and the award of attorney's fees.

## FACTS

On March 30, 1991, respondent Beth Arnoult ("Arnoult") was paralyzed from the waist down following an accident in which she flipped over forward while riding a 1988 model YFM200DX Yamaha Moto 4 four-wheel all-terrain vehicle ("ATV"), in the desert north of Las Vegas. She was not wearing a helmet.

Arnoult was travelling at approximately one-half of the vehicle's maximum speed[1] as she climbed a three-foot sand dune with a face angle of approximately thirty degrees. Although Arnoult had successfully traversed the sand dune prior to the accident, she was launched forward on a second attempt as the machine rotated "back over front." Eyewitnesses testified that Arnoult was not operating the ATV in an unsafe manner. To the best of her recollection, she had ridden the ATV on three previous occasions.

Arnoult sued appellant, Yamaha Motor Corporation, U.S.A. ("Yamaha"), on theories of strict products liability and negligence, alleging, *inter alia,* that an improperly designed suspension and inadequate warnings were the proximate cause of her injuries. At trial, the district court certified Dr. Waymon Johnston ("Johnston") as Arnoult's warnings expert, and Dr. Richard McLay ("McLay") as an expert in mechanical engineering and accident reconstruction. Yamaha elected not to have its warnings expert testify.

Arnoult testified that she spent about twenty minutes reading the owner's manual prior to the accident, and that she applied some of the techniques used in her snowmobiling experience to operate the ATV. She acknowledged that, after reading the owner's manual, she understood that "jumping" the ATV could cause serious injuries. Arnoult testified that, at the time of the accident, she tried to stay on the ATV until it was virtually in a vertical pitch, after which she only recalled lying on the ground in extreme pain.

Arnoult had been a very active twenty-five-year-old woman with a bachelor of science degree in mathematics from Iowa State University. Since the accident, she has experienced severe back pain, intermittent loss of bowel and bladder function and is

---

[1]The maximum speed of the "ATV" was forty miles per hour.

unable to perform routine household chores. Her paraplegia is expected to be permanent.

Following a three-week trial, the jury awarded Arnoult $3,600,000 in damages. The jury, via a special verdict, grounded liability upon Yamaha's failure to warn. It did not find the existence of a defect in the design of the ATV.[2] Thereafter, the district court awarded Arnoult attorneys' fees in the amount of $237,100 under NRCP 68.

## DISCUSSION

*Failure to warn*

### A. *Standard of review*

If the district court's findings are supported by substantial evidence, they will be upheld. Nelson v. Peckham Plaza Partnerships, 110 Nev. 23, 25, 866 P.2d 1138, 1139 (1994). Substantial evidence is that which " 'a reasonable mind might accept as adequate to support a conclusion.' " State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986) (quoting Richardson v. Perales, 402 U.S. 389 (1971)). This court is not at liberty to weigh the evidence anew, and where conflicting evidence exists, all favorable inferences must be drawn towards the prevailing party. Smith v. Timm, 96 Nev. 197, 202, 606 P.2d 530, 532 (1980).

### B. *Burden of proof*

To establish a prima facie case of negligence or strict tort liability, a plaintiff must satisfy the element of proximate causation. This court has long recognized that to establish proximate causation "it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." Crosman v. Southern Pacific Co., 42 Nev. 92, 108-09, 173 P. 223, 228 (1918) (citations omitted). Proximate causation is generally an issue of fact for the jury to resolve. Nehls v. Leonard, 97 Nev. 325, 328, 630 P.2d 258, 260 (1981).

### C. *The adequacy of the warnings in the owner's manual*

Nevada law requires that warnings adequately communicate any dangers that may flow from the use or foreseeable misuse of a

---

[2]Although the jury found Yamaha negligent, it did not find that the negligence was the proximate cause of Arnoult's injuries.

product. Fyssakis v. Knight Equipment Corp., 108 Nev. 212, 214, 826 P.2d 570, 571-72 (1992). This court has articulated the conditions under which such liability may be established:

> Where the defendant has reason to anticipate that danger may result from a particular use of his product, and he fails to warn adequately of such a danger, the product sold without a warning is in a defective condition. Strict liability may be imposed even where the product is faultlessly made, if it was unreasonably dangerous to place the product in the hands of the consumer without adequate warnings concerning its safe and proper use.

Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 624, 668 P.2d 1075, 1080 (1983).[3]

Although Yamaha conceded that the ATV model at issue was suitable for riding in desert terrain, its primary defense to the warnings claim was that Arnoult was attempting a jumping maneuver in contravention of warnings which she clearly understood. Thus, Yamaha claims that the nature of the warnings in the owner's manual could not have been the proximate cause of the incident in which her injuries were sustained.

More particularly, Yamaha contends that the laws of physics dispel Arnoult's claim that she was not attempting a jump. At trial, Yamaha characterized Arnoult's alleged jump as a "stunt" or a "hellacious jump," and that the vehicle's speed, combined with the thirty-degree slope, catapulted her in the air for approximately .7 seconds, allowing the ATV to rotate. Yamaha, therefore, maintains that, rather than inadequate warnings, operator error was the actual and proximate cause of this incident. In this, Yamaha relies in part on Arnoult's warnings expert, Dr. Waymon Johnston. Dr. Johnston testified that becoming airborne and collisions with other vehicles were the only dangers in connection with "cresting a hill" which should have been the subject of warning information. Thus, Yamaha argues, Arnoult must have been jumping or the incident could not have occurred.

Yamaha seemingly argues that becoming airborne on an ATV for any reason is tantamount to jumping. However, becoming airborne does not, necessarily, determine the issue of whether Arnoult was *attempting* a jump in contravention of the warnings manual.[4] This is also true with regard to the fact that the ATV

---

[3] The jury instruction on this issue essentially mirrored this language.

[4] Yamaha relies on letters to friends that Arnoult was injured when she "fell off" the ATV while "going over a jump." This does not prove that, as a matter of law, she was attempting a "jump." This was simply another piece

"flipped." The jury was entitled to reject Yamaha's "jumping" theory and base its decision on the testimony of numerous eyewitnesses, even if the vehicle did become airborne. Also, the eyewitnesses were corroborated by Dr. Richard McLay, plaintiff's mechanical engineering and accident reconstruction expert. He testified that the evidence was inconsistent with Yamaha's jumping theory because Arnoult's point of rest following the spill was inconsistent with a high rate of speed. Although this testimony was disputed, the jury could have concluded that Arnoult was not attempting a "hellacious jump, a huge jump, [or] a stunt."

We conclude that the warnings issue was sufficiently developed for submission to the jury with competent evidence. While there were warnings against jumping, the jury could have reasonably concluded that the warnings were inadequate to advise the novice user of how jumping could be avoided while using the vehicle as depicted (*i.e.*, over rough desert terrain within the speed capabilities of the vehicle).

Dr. Johnston recommended that an "X" be inscribed over a diagram or picture of a four-wheeled vehicle jumping with written warnings stating: "Avoid jumping or else" and "You could be seriously injured." Additionally, the owner's manual does not address the possibility of flipping forward when the brakes are applied while cresting a hill or while trimming the throttle. Further, and most tellingly, the manual depicts a rider climbing a thirty-degree slope in the exact manner as attempted by Arnoult. Thus, in our view, the district court properly allowed the jury to consider whether the owner's manual sufficiently apprised a novice rider like Arnoult of the dangers of flipping forward while hill climbing at one-half of the vehicle's maximum speed.

In this connection, Yamaha's expert, Walter Reed, testified that on smaller desert undulations, operating the ATV at approximately "half-speed" was problematic:

> Q: And in all of this time and all of this work and all of these years of experience, you've now decided that the operator of a 1988 DXU 200 shouldn't go at less than half the available speed of the vehicle over a hill approximately 2 feet?
>
> A: I would agree that I would now recommend that a person not do that. But I probably would have recommended before even starting this analysis that a person not do that.

of evidence for the jury to consider on this issue. Certainly, under Dr. Johnston's testimony, the danger pertinent to this case, which should have been the subject of warnings, was leaving the ground. However, inadvertently leaving the ground while operating an ATV within its speed capabilities is not, necessarily, the equivalent of attempting a jump within the contemplation of the owner's manual; nor is "going over a jump."

He also testified that letting off the throttle and retracing the same tracks could contribute to a pitch. It was on Arnoult's second pass that she injured herself.

Yamaha correctly notes that it was not required to warn against dangers that are generally known. General Electric Co. v. Bush, 88 Nev. 360, 365, 498 P.2d 366, 369 (1972). However, Arnoult presented sufficient evidence for the jury to conclude that her use of the ATV was foreseeable and potentially dangerous to the novice, and that it was not generally known that a novice rider could sustain serious injuries when operating the vehicle as described by the witnesses. It was also foreseeable that a rider would emulate the depiction in the owner's manual of a rider climbing a hill with a thirty-degree slope at half-throttle. Further, for the reasons stated, using the ATV in this manner does not constitute abuse or misuse of the vehicle.

In determining whether the jury's finding was supported by substantial evidence, we must presume that the jury found evidence favorable to Arnoult and that all reasonable inferences were resolved in Arnoult's favor. *See* Steen v. Gass, 85 Nev. 249, 253, 454 P.2d 94, 97 (1969). After weighing the entirety of the evidence, the jury was entitled to conclude that Yamaha fell short of its duty to properly warn of foreseeable dangers when using the ATV *as suggested.* The issue as to whether Arnoult attempted a "hellacious jump or a stunt" was a question of fact for the jury, which it ultimately decided in Arnoult's favor.

*Whether the trial court abused its discretion in admitting the testimony of Arnoult's expert witness, Dr. Waymon Johnston*

A. *Standard of review*

"The competency of an expert witness is a question for the sound discretion of the district court, and we will not disturb the ruling absent a clear abuse of discretion." Brown v. Capanna, 105 Nev. 665, 671, 782 P.2d 1299, 1303 (1989); *see also* General Electric Co. v. Joiner, 118 S. Ct. 512 (1997) (reiterating that an abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude expert testimony). This principle was reinforced in Hanneman v. Downer, 110 Nev. 167, 179, 871 P.2d 279, 287 (1994), in which the court stated:

> The district court is better suited to rule on the qualifications of persons presented as expert witnesses and we will not substitute our evaluation of a witness's credentials for that of the district court absent a showing of clear error.

## B.  *Admissibility of expert testimony*

Yamaha also argues that Arnoult failed to meet her burden of proof with regard to the warnings issue because her warnings expert proffered unsupported opinion testimony with no scientific basis. Yamaha contends that the district court failed in its "gate-keeping" role under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), in connection with the testimony of Arnoult's sole warnings expert, Dr. Waymon Johnston. *Daubert* overturned the landmark case of Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

Under *Frye,* scientific evidence offered through expert opinion was only admissible if based upon a technique that had gained "general acceptance" in the scientific community. The *Daubert* court concluded that this "general acceptance" had been super-seded by the adoption of Rule 702 of the Federal Rules of Evidence. Rule 702 explicitly requires that such testimony "assist the trier of fact to understand or determine a fact in issue." Thus, *Daubert* expands a trial court's discretion in the evaluation of the reliability and relevance of scientific evidence. This evaluation process is characterized as "gatekeeping."

"Gatekeeping" under *Daubert,* requires the trial court to engage in a two-part analysis: (1) to determine whether the evidence is based on "scientific knowledge"; and (2) whether the evidence is relevant, *i.e.,* that it will "assist" the trier of fact. *Daubert,* of course, expands the boundaries of admissible expert testimony as long as some indicia of reliability and accuracy are satisfied. *Daubert,* 509 U.S. at 579.

*Daubert*'s applicability, however, is still unclear. For example, in Lappe v. American Honda Motor Co., Inc., 857 F. Supp. 222, 228 (N.D.N.Y. 1994), the court concluded that factors listed in *Daubert* for evaluating the admissibility of testimony are limited to "novel scientific evidence" under FRE 702, and thus *Daubert* is confined to assessing the "outer boundaries" of a body of scientific and technical knowledge.[5]

---

[5]FRE 702 governs the admissibility of scientific and technical evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, train-ing, or education, may testify thereto in the form of an opinion or otherwise.

NRS 50.275 tracks the federal rule: "If scientific, technical or other special-ized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowl-edge, skill, experience, training or education may testify to matters within the scope of such knowledge."

To date, we have not adopted the *Daubert* test. We conclude that *Daubert* does not apply to this case because, while some empirical behavioral testing may be involved in assessing the efficacy of different warnings, warnings expertise does not, in its entirety, implicate the natural "laws of science." Unlike the case at bar, *Daubert* dealt with the admissibility of causation evidence in a case where the drug Bendectin allegedly caused birth defects. Here, the assessment of warnings falls within the area of "specialized knowledge" that may be the subject of expertise not totally governed by the scientific method.[6]

In Townsend v. State, 103 Nev. 113, 117, 734 P.2d 705, 708 (1987), we noted that the threshold test for the admissibility of expert testimony turns on whether the expert's specialized knowledge will assist the trier of fact in understanding the evidence or an issue in dispute. This requirement essentially satisfies the statutory conditions codified in NRS 50.275 which mirrors Rule 702. We further stated in *Townsend* that the admissibility of such evidence must also satisfy the prerequisites of all relevant evidence, *i.e.*, that its probative value is not substantially outweighed by its prejudicial effect. *Id.* at 118, 734 P.2d at 708.

We conclude that Dr. Johnston's credentials demonstrate that he was qualified to testify with regard to the sufficiency of the warnings in the case at bar. Dr. Johnston holds masters and doctoral degrees in industrial engineering with specializations in human factors engineering and ergonomics from Texas Tech University. His work experience included service with McDonnell Douglas Corporation as a senior engineer on Gemini spacecraft and assistant professor of safety engineering at Texas A&M University with twenty-four years of tenure (until his retirement, Dr. Johnston taught graduate and undergraduate courses at Texas A&M in industrial engineering on product safety design and safety warnings). Finally, numerous corporations have enlisted Dr. Johnston's services as a safety consultant.

Dr. Johnston noted that, while the owner's manual provides information on how to avoid a backward flip, none is provided as to the avoidance of forward flips. He also testified that the manual is totally silent in instructing the user concerning conditions that

---

[6]Expert testimony is not restricted to areas of inquiry governed by the laws of science. Non-scientific expertise has been found admissible (helpful to the fact finder) in many other contexts. By way of examples, experts in legal malpractice, psychology, insurance bad-faith and accounting malpractice have been allowed to testify where their specialized knowledge satisfies FRE 702 or NRS 50.275, et. seq.

could contribute to a forward pitch roll when cresting a hill similar to the one depicted in the owner's manual. Based upon his specialized knowledge as an experienced safety engineer, Dr. Johnston concluded that the owner's manual failed to adequately warn of the dangers which caused Arnoult's injuries.

We will not disturb a district court's sound discretion in determining the competency of an expert witness absent a clear abuse of discretion. *Hanneman,* 110 Nev. at 179, 871 P.2d at 287. Dr. Johnston's testimony was based upon specialized knowledge that assisted in the assessment of the warnings contained within Yamaha's owner's manual.

*Whether jury instruction number nine incorrectly stated the law, and if so, whether reversal is warranted*

Yamaha argues that jury instruction number nine improperly directed a verdict against it:

> Plaintiff also seeks to recover damages based upon a claim of a defective product.
>
> A product may be defective because of a defect in its design or because of a failure to warn the consumer of a hazard involved in the foreseeable use of the product.
>
> Defendant is not liable for an abnormal or unintended use of its product but is liable for a foreseeable misuse.

Yamaha focuses on that portion of the jury instruction which stated that "[the] defendant *is* liable for a foreseeable misuse." (Emphasis added.) Yamaha urges that the use of "is" incorrectly placed an unconditional and absolute liability for any foreseeable misuse of the ATV without regard to whether the warnings in the owner's manual were adequate and without regard to whether the danger in connection with its use was obvious or known.

In Otterbeck v. Lamb, 85 Nev. 456, 456 P.2d 855 (1969), this court reviewed a jury instruction where one sentence correctly stated the law while another did not. As noted by the *Otterbeck* court, the issue is whether the incorrect sentence is erroneous and thus prejudicial, warranting reversal. *Otterbeck,* 85 Nev. at 461, 456 P.2d at 859.

Arnoult argues that the instructions in their totality informed the jury that liability would not lie unless they first found the product defective. The first jury instruction stated, in pertinent part:

> If, in these instructions, any rule, direction or idea is repeated or stated in different ways, no emphasis thereon is intended by me and none may be inferred by you. For that

reason, you are not to single out any certain sentence or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole and regard each in light of all the others.

Instructions twelve and thirteen address in part the problem of which Yamaha now complains. Jury instruction twelve stated:

A product must include a warning that adequately communicates the dangers that may result from its use or foreseeable misuse; otherwise the product is defective.

Jury instruction thirteen read as follows:

A product, though faultlessly made, is defective for its failure to be accompanied by suitable and adequate warnings concerning its safe and proper use, if the absence of such warnings renders the product unreasonably dangerous.

Finally, the special interrogatory on the warnings issue restricted the scope of recovery:

Did the warnings provided with the ATV adequately communicate the dangers that may result from the use or foreseeable misuse of the ATV?

By answering the question in the affirmative, the jury was forced to condition any liability in connection with foreseeable misuse on the failure to include adequate warnings in the manual.

We conclude that, when read together, the jury instructions and the special verdict form were not prejudicially misleading on this point. Moreover, for liability to obtain, the jury must have concluded that Arnoult's injury resulted from foreseeable *use* as opposed to foreseeable *misuse* of the ATV, *i.e.*, if it found she had been attempting a "jump" or "stunt," they would have had to have found for the defense based on Arnoult's testimony regarding her understanding of the warnings manual. Thus, even if instruction number nine ascribed absolute liability for the foreseeable *misuse* of Yamaha's product, such was not prejudice warranting reversal and a new trial.

### Refusal to allow the deposition testimony of Takumi Fukui

Yamaha contests the trial court's refusal to admit the deposition testimony of Takumi Fukui ("Fukui"), an engineer for Yamaha Motor Company, Ltd., ("YMC").[7] Fukui, a resident of Japan, was instrumental in the design and developmental testing of the ATV. His deposition was taken by Yamaha in California on March 10, 1995.

---

[7]Yamaha Motor Company, Ltd., is an affiliate of Yamaha. Although a named party, Yamaha Motor Company, Ltd., was not served and did not actively participate in the litigation.

Arnoult's experts, Drs. McClay and Johnston, relied on Fukui's deposition testimony. Yamaha contends that these witnesses falsely represented his deposition testimony at trial. Despite these claims, the district court refused to allow Yamaha to cross-examine Dr. Johnston with Fukui's deposition transcript, or allow portions of the transcript to be read in response to Dr. Johnston's testimony.[8] The reason for this ruling relates to problems encountered during pre-trial discovery. The complaint in this matter was filed on March 5, 1993. For a time, the litigation was marked by charges and countercharges of discovery abuses. Our review of the record confirms that both sides, by design, omission or the pressure of tightly wound time frames, respectively created and attempted to solve their mutual difficulties. Suffice it to say, neither side can lay claim to the "high ground" in this regard. Thus, an appreciation of the procedural history of the matter is necessary to a resolution of this particular claim of error.

Although the complaint was filed in March of 1993, the NRCP 16.1 "Scheduling Order" was not lodged until November 5, 1993. The parties were instructed at that time that discovery was to be completed by June 10, 1994, and to be ready for trial by July 11, 1994. Because of the likelihood that a trial date would not be set for many months subsequent to the "trial ready" date, the parties jointly applied for an accelerated trial setting. As a result, the trial was set for May 31, 1994. This, of necessity, required the parties to expedite preparation for this rather complex piece of litigation.

During the spring of 1994, the parties had several occasions to seek relief from the discovery commissioner of the Eighth Judicial District Court. Discovery problems resulted in a brief continuance of the trial from May 31 to August 15, 1994. A May 5, 1994 order issued by the discovery commissioner compelled Arnoult to comply with certain discovery requests and ordered Yamaha to produce its experts for deposition on fifteen days' notice. Later, on June 16, 1994, citing abuses by Yamaha in the discovery process, the discovery commissioner excluded Fukui from testifying by way of deposition as a NRCP 30(b)(6) witness or as an expert. Fukui was not, however, excluded as a trial witness.

On the eve of trial, Yamaha became aware that a preliminary order prohibiting modification of the subject ATV had been violated by Arnoult's experts or representatives.[9] Rather than

---

[8]Yamaha contends that if Fukui's testimony had been heard in its entirety, the jury would not have agreed with the premise that the design of the ATV gave rise to a hill-climbing hazard requiring different or stronger warnings.

[9]The modification was made before defense experts examined the ATV. When this revelation occurred, it became apparent that the defense testing

grant Yamaha's motion to dismiss the matter because of Arnoult's violation of the preliminary order, the court properly vacated the trial date so that the defense could address problems with its testing caused by the modification. Months later, the district court re-set the trial for June 12, 1995, with a discovery cut-off of May 1, 1995. It is important to note that no interaction between the parties and the discovery commissioner occurred between June of 1994 and the trial in June of 1995.

Ultimately, Fukui was deposed as a "fact" witness on March 5, 1995. During his deposition, Yamaha produced several technical documents written in Japanese in connection with its questioning of the witness that had not been previously produced. These documents clearly fell within the scope of prior discovery requests. The documents included test results which, according to prior interrogatory responses, should have been produced.

Fukui was not designated as an expert until May 4, 1995, four days after the discovery cut-off.[10] Although the district court would have allowed his live testimony, it ultimately excluded any use of his deposition transcript at trial.

The Colorado Court of Appeals has correctly articulated the standard for admission of deposition testimony of non-party witnesses at trial:

> [T]his rule [unavailability of the witness] is subject to the underlying purpose of the judicial system to promote fairness and, thus, ensure that "the battlefield remains level." In fulfilling this obligation, *the trial court has broad discretion to conduct trial so as to protect the rights of both parties, including the responsibility to eliminate secrets and surprises.* Accordingly, the trial court's rulings concerning the admission of depositions pursuant to C.R.C.P. [same as NRCP 32][11] will not be disturbed absent an abuse of discretion.

would have to be repeated. Although plaintiff's counsel placed substantial sums at the disposal of the defense to pay for the expenses of re-testing, the fact of the modification justifiably raised the specter of severe credibility problems with plaintiff's litigation team.

[10]At one point during the proceedings, Yamaha renounced any intention to call Fukui as an expert. However, the trial court was of the belief that his testimony would fall within the confines of expert testimony.

[11]NRCP 32 provides in pertinent part:

    (a) Use of depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had

Stoczynski v. Livermore, 782 P.2d 834, 835 (Colo. Ct. App. 1989) (emphasis added, citations omitted and footnote added).

Because Arnoult did not identify her principal trial expert, Dr. Johnston, until February 24, 1995, six months after the cut-off date for the original trial, Yamaha maintains that the district court created a double standard by disallowing any use of Fukui's deposition transcript. Yamaha also contends that Fukui's deposition was admissible under NRCP 32 because Fukui, a Japanese resident, was "at a distance greater than 100 miles from the place of trial." Yamaha also argues admissibility because of the expense and the fact that Yamaha never attempted to procure his absence.

If the trial court's sole reason for excluding Fukui's deposition testimony stemmed from the discovery disputes prior to the vacation of the August 1994 trial date, it would have been an abuse of discretion to exclude the use of the transcript. At that point, both sides were responsible for discovery problems that necessitated trial continuances. However, the district court could reasonably have concluded that the production of new foreign language documents at the March 1995 deposition had the effect of compromising Arnoult's cross-examination. Additionally, Yamaha had previously represented that all such documents had been produced, Fukui was not designated as an expert until after the deadline (he had previously been listed as a "fact" witness), nor was Yamaha prevented from eliciting live testimony from Fukui. Therefore, the district court did not abuse its discretion in refusing use of the deposition transcript at trial during Yamaha's case in chief.[12]

*The award of special damages*

Yamaha contends that reversible error was committed because

reasonable notice thereof, in accordance with any of the following provisions:

. . . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (A) that the witness is dead; or (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the State, unless it appears that the absence of the witness was procured by the party offering the deposition . . . .

[12]As stated above, Yamaha argues that the district court abused its discretion in refusing its attorney's permission to cross-examine Arnoult's experts with Fukui's deposition transcript. Although Yamaha claims prejudice in this refusal because Arnoult's experts relied upon and misrepresented Fukui's testimony, Yamaha has not stated the nature of the misrepresentations in the briefs and has not referred to an offer of proof made at trial to that effect.

the jury was permitted to consider Arnoult's future medical expenses on the special verdict form. Yamaha also contests the propriety of including past and future household service losses and past and future costs of disablement as damage categories within the special verdict form.[13]

Yamaha maintains that Arnoult failed to carry her burden of proof as to the type, nature, and extent of future medical treatment. Thus, Yamaha argues that the $500,000 award for future medical expenses was speculative.

An award of future medical expenses must be supported by sufficient and competent evidence. K-Mart Corp. v. Washington, 109 Nev. 1180, 1196, 866 P.2d 274, 285 (1993). Arnoult's internist, Dr. B.S. Purcell, testified that Arnoult's paraplegia has led to persistent bowel problems which may cause potentially deadly bouts of infection. Dr. John Thalgott, the orthopaedic surgeon who performed Arnoult's post-accident surgery, reinforced the likelihood of recurrent urinary tract infections. He also testified that Arnoult will encounter debilitating and deteriorating skin breakdown which will precipitate the onset of decubitus ulcers. Joanne Toadvine, founder and president of the "Help Them Walk Again Foundation," testified to a survey conducted through her organization which confirmed that costs of hospitalization for the treatment of decubitus ulcers could approach $350,000.

Yamaha relies on Saide v. Stanton, 659 P.2d 35 (Ariz. 1983), in which the Arizona Supreme Court held that awards of future medical expenses must be supported by medical evidence that there is a reasonable probability that such expenses will be incurred. Arnoult presented competent medical testimony as to the accrued medical costs sustained as of the date of trial and that her injuries would require recurrent medical attention. Thus, we conclude that the district court did not err in permitting the jury to consider Arnoult's future medical expenses. *See* Seymour v.

---

[13]The jury assessed damages in the special verdict form as follows:

|     |                                   |       |              |
| --- | --------------------------------- | ----- | ------------ |
| A:  | Past medical expenses             |       | $ 200,000    |
| B:  | Past lost wages                   |       | $ 55,000     |
| C:  | Past pain and suffering           |       | $ 300,000    |
| D:  | Past household service lost       |       | $ 35,000     |
| E:  | Past cost of disablement          |       | $ 10,000     |
|     |                                   | TOTAL | $ 600,000    |
| F:  | Future medical expenses           |       | $ 500,000    |
| G:  | Future lost wages                 |       | $ 300,000    |
| H:  | Future pain and suffering         |       | $1,500,000   |
| I:  | Future household service loss [sic] |     | $ 300,000    |
| J:  | Future cost of disablement        |       | $ 400,000    |
|     |                                   | TOTAL | $3,000,000   |

Carcia, 604 A.2d 1304, 1306 (Conn. 1992) (citing with approval Willson Safety Products v. Eschenbrenner, 788 S.W.2d 729, 733 (Ark. 1990)). Finally, given the testimony regarding certain likely treatment costs, the award of future medical expenses is supported by substantial evidence in the record.

Yamaha also argues that the additional categories of "past and future household services lost" and "past and future cost of disablement" were without factual basis. It further contends that these categories are cumulative of the other categories delineated in the special verdict form, and that the district court erred in failing to define the terms used for these damage categories.

The propriety of these categories raises an issue of first impression for Nevada. We note that loss of household services does not fit within any of the other categories listed in the verdict form; therefore, it would qualify as a separate compensable economic loss. We conclude that there was substantial evidence in the record to support the awards for past and future household services. Although Arnoult's economist was not qualified as a physician, the elements of this loss were adequately demonstrated by other competent evidence upon which he could make his projections. However, allowing recovery for costs of disablement, without adequate definition, had the potential for duplication of recovery because these costs could, at least in part, overlap with the award of future medical expenses. Also, the award seems speculative because the economist did include numerous medical and household service expenses in his analysis of the cost of disablement. Thus, because no defining instruction was offered, and because the award was based on duplicative evidence, the damage award is vacated and the district court is instructed to reduce the same by $410,000. On all other damage issues, the jury was properly given the choice between projections proffered by the parties.

Yamaha also argues that the categories for household services and disability costs were inserted into the verdict form after closing arguments, thus depriving it of an opportunity to, "at the very least," comment on the categories to the jury in its closing argument.[14] The record reflects that the district court announced the inclusion of these categories between Arnoult's and Yamaha's closing arguments. Yamaha's timely objection to these categories was overruled.

---

[14]Elsewhere in its opening brief on appeal, Yamaha does mention that the change in the verdict form was made prior to its closing remarks.

We conclude that Yamaha was sufficiently aware of the evidence regarding these claims that the timing of the change in the verdict form was not prejudicial. Further, counsel did not request a recess to construct an argument addressing these issues, and addressed no damage issues in his closing remarks. Thus, regardless of the timing of the inclusion of these damage components in the special verdict, there is no indication that counsel would have submitted an argument on this damage issue.

Accordingly, with the exception of the award for past and future disability costs, we conclude that the district court did not err in altering the verdict form to include the aforementioned categories.

*Attorney's fees under NRCP 68*

On June 1, 1995, Arnoult served defense counsel with an offer of judgment in the amount of $2,500,000. This offer was rejected and the matter proceeded to trial on June 12, 1995. The amount of the verdict exceeded the offer by 1.1 million dollars. The district court awarded Arnoult $237,100 in attorney's fees pursuant to NRCP 68.

Yamaha contends that the award constitutes an abuse of discretion because of a misapplication of Beattie v. Thomas, 99 Nev. 579, 668 P.2d 268 (1983). Under *Beattie*, the trial court must carefully weigh the following factors in exercising its discretion to award fees under NRCP 68:

> (1) whether the plaintiff's claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount.

*Id.* at 588-89, 668 P.2d at 274. "[U]nless the trial court's exercise of discretion [in evaluating the *Beattie* factors] is arbitrary or capricious, this court will not disturb the lower court's ruling on appeal." Schouweiler v. Yancey Co., 101 Nev. 827, 833, 712 P.2d 786, 790 (1985).

Both sides vigorously litigated the *Beattie* factors before the trial court. The written order formally awarding Arnoult's fees and the oral pronouncements of the district court demonstrate that all of the factors were considered. However, Yamaha contends that, because it was the offeree (a recipient of a plaintiff's offer of judgment), the trial court improperly weighed whether Arnoult's

claim was brought in good faith, and erred in finding that Yamaha's refusal to accept the offer of judgment was in bad faith.

All parties agreed that Arnoult's claims were brought in good faith for the purposes of NRCP 68 and the district court so found. However, Yamaha contends that the first *Beattie* factor should only apply when the defendant is the offeror.[15] Yamaha argues that the first factor the trial court should weigh where the defendant is the offeree is whether the *defendant's* claim or defense was brought in good faith. In this connection, it would seem meaningless to weigh whether Arnoult's claim was brought in good faith because she was the prevailing party. Thus, we conclude that the trial court should have taken into account whether Yamaha's defenses were litigated in good faith. If the good faith of either party in litigating liability and/or damage issues is not taken into account, offers would have the effect of unfairly forcing litigants to forego legitimate claims. *See Beattie,* 99 Nev. at 588, 668 P.2d at 274.

The trial court also found that Yamaha's refusal of the offer, while not grossly unreasonable, was "in bad faith." In so finding, the court noted the severity of Arnoult's injuries, that she was a compelling claimant, and the fact that the verdict exceeded the offer by 1.1 million dollars. Because the liability issues in this matter were quite intricate, and because Yamaha was successful on two of the three substantive claims set forth in Arnoult's complaint, it appears that the trial court may not have weighed appropriately the liability issues in this analysis.

Thus, we reverse that portion of the district court's order awarding attorney's fees to Arnoult and remand with instructions to re-evaluate whether attorney's fees should be awarded in this matter. In doing so, the district court is instructed to consider both liability and damage issues in weighing whether the defense of the matter was brought in good faith, and whether the rejection of the offer was grossly unreasonable or in bad faith.[16]

After a careful review of the record we conclude that Yamaha's remaining assignments of error are without merit.

---

[15]In Uniroyal Goodrich Tire v. Mercer, 111 Nev. 318, 323, 890 P.2d 785, 789 (1995), we applied the *Beattie* factors to a plaintiff's offer of judgment served under NRCP 68. We did not however, reach the issue presented herein.

[16]The district court is reminded that no one factor under *Beattie* is determinative and that it has broad discretion to grant the request so long as all appropriate factors are considered.