THOMAS MARSHALL WILKINS, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 11628

April 9, 1980                                     609 P.2d 309

*Sinai, Ohlson, Schroeder, Specchio & Albright,*[1] Reno, for Appellant.

*Richard Bryan,* Attorney General, Carson City; *Michael S. Rowe,* District Attorney, Douglas County; *William J. Crowell, Jr.,* Special Prosecutor, Carson City, for Respondent.

---

[1]Other counsel represented appellant in the proceedings below.

## OPINION

By the Court, MOWBRAY, C. J.:

Thomas Marshall Wilkins was convicted by a jury of the second degree murder of his wife, Jo Aline Wilkins. Wilkins appeals, raising twelve claims of error. We find no error, and affirm. Since many of appellant's objections have either been waived or are devoid of merit, we choose to discuss only four of those issues: (1) the juror selection process; (2) the admission of appellant's inculpatory statements; (3) the *Allen* charge to the jury; and (4) the sufficiency of the evidence.

### THE FACTS

In November, 1976, a bottle hunter discovered the badly decomposed remains of a body, wrapped in a plastic sack, in a makeshift grave located in a remote area southeast of Gardnerville. The body was identified, through a comparison of dental records, as that of Jo Aline Wilkins, appellant's wife. Jo had been missing since April 30, 1975. Because of the body's advanced state of decomposition, the cause of death could not be ascertained with certainty. Asphyxiation, however, was stated as the most probable cause. Medical records indicated that, prior to her disappearance, Jo had been in excellent health. The body was discovered in an area frequented by appellant during his fishing trips.

One day prior to her disappearance, Jo had told a friend that she was going on a camping trip with her husband on the following day. Jo had stated as well that, after the trip, she planned to leave her husband, take her children by car to New Mexico, and start divorce proceedings. One day earlier, appellant confided to another person that he would foil his wife's expectations by secretly departing with the children.

After Jo's disappearance, appellant told the police that, following a heated argument, Jo had decided to hitchhike to her parents' home in New Mexico, leaving the children in his care. Appellant later stated that Jo might have taken a bus to New Mexico, explaining that her car was inoperable. Various records indicated that Jo's car had been recently repaired.

The day after Jo's disappearance, appellant moved to Oregon. A search of appellant's Oregon residence, after the discovery of Jo's body, revealed that appellant was in possession of most of her jewelry and personal possessions. In addition, appellant had forged his wife's name on her last paycheck, which he had cashed.

Other evidence at trial indicated that appellant and his wife had been involved in a major struggle over the custody of their children. There was testimony that Jo would not give up the children. Testimony indicated that appellant had been beating Jo, and that she was afraid that her husband might kill her. In addition, appellant had expressed his dislike of his wife to various people.

At trial, a police officer testified that, upon informing appellant that Jo had been found, appellant had spontaneously replied that he did not kill her. According to the officer's testimony, appellant had not yet been informed that Jo was dead.

The case, predicated to a large extent on circumstantial evidence, was tried to a jury. After fifteen hours of deliberation, over a two day period, the jury informed the trial judge in writing that it could not reach a unanimous verdict because "the evidence is not sufficient to return a verdict of guilty of murder." The jury was then given an *Allen* charge. Six hours later, the jury returned a guilty verdict of second degree murder. This appeal followed.

## THE SELECTION OF THE JURY

Anticipating a lengthy juror selection process, the district judge suggested that one half of the jury venire be called on each of the first two days of juror selection. Over appellant's objection, the clerk summoned all members of the venire whose last names began with the letters A through H on the first day, and the remainder of the venire on the second day. The entire venire was called from the third day on.

The selection process lasted one week. The final jury panel consisted of four jurors who had been summoned on the first day, one juror who had been called on the second day, and seven jurors plus two alternates who had been selected from the

full venire. The parties utilized sixteen peremptory challenges, four on the second day and twelve thereafter.

Appellant contends that this irregular method of selecting the prospective jurors prevented the final panel from being drawn "from a cross-section of the community," Marquez v. State, 91 Nev. 471, 473, 538 P.2d 156, 157 (1975), and that he was therefore denied due process of law. We disagree.

Appellant concedes that the instant selection process, though irregular, is tantamount neither to the "systematic exclusion of members of a race or class," *id; see also* Collins v. State, 88 Nev. 9, 13, 492 P.2d 991, 993 (1972), nor to the systematic exclusion of all individuals adhering to a particular philosophical or conscientious belief, *see* Bean v. State, 86 Nev. 80, 86, 465 P.2d 133, 138 (1970). In addition, appellant has not suggested any theory under which the instant selection process could have prejudiced him or his trial. *See* State v. Stella, 42 Nev. 467, 470, 180 P. 980, 981 (1919). We reiterate our previous holdings that absent either a showing of systematic, class-based exclusion of prospective jurors or a showing of prejudice, an irregularity in the selection of jurors, without more, must be deemed harmless error.

## APPELLANT'S INCULPATORY STATEMENTS

At trial, Rodney Englert, an Oregon law enforcement officer, testified that when he informed appellant that Jo had been found, appellant had responded, "Fine, I have nothing to hide. I didn't kill her." According to this testimony, Englert then replied, "Who said she was dead?" This conversation was recounted as well by the prosecutor during his opening remarks.

Appellant contends, for the first time on appeal, that the admission of these statements into evidence was error since they were obtained from him in violation of his Fifth Amendment rights, *see* Miranda v. Arizona, 384 U.S. 436 (1966), and in violation of his Sixth Amendment right to counsel, *see* Escobedo v. Illinois, 378 U.S. 478 (1964). Appellant further contends that the lower court should have conducted, on its own motion, a voluntariness hearing regarding those statements in accordance with Jackson v. Denno, 378 U.S. 368 (1964).

Appellant, however, did not object to the admission of these statements. Nor did appellant move to suppress them either before trial, *see* NRS 174.125(1) and (3)(a), or during the trial, *see* NRS 174.125(3)(b). Appellant did not request a voluntariness hearing, nor did he request that the jury be instructed on the voluntariness issue. Nor can appellant now claim that he

was surprised by the admission of these statements. The prosecutor's opening remarks and Englert's testimony conformed to the evidence adduced at appellant's preliminary examination. Moreover, the district judge, prior to trial, made sure that appellant had copies of all his alleged admissions, and specifically inquired of appellant's counsel whether any suppression motions would be filed concerning these statements.

As a general proposition, the failure to follow statutory procedures for challenging the admissibility of evidence, as well as the failure to raise a proper objection below, will preclude appellate review of the disputed evidence. Smithart v. State, 86 Nev. 925, 928–29, 478 P.2d 576, 579 (1970). While this Court may, at times, review questions of constitutional dimension even in the absence of a proper objection, it will not do so unless the record is developed sufficiently both to demonstrate that fundamental rights are, in fact, implicated and to provide an adequate basis for review. *Id.* Based on the instant factual record, we cannot even tell whether the interrogation of appellant by Officer Englert was a part of a pre-custodial investigation or of a custodial or inherently coercive interrogation. *Compare* Schnepp v. State, 84 Nev. 120, 122, 437 P.2d 84, 85 (1969). Thus, appellant's failure to raise a timely objection to the admission of these statements constitutes, in this case, a waiver of his Fifth and Sixth Amendment claims.

In addition, a trial court is not obligated to conduct a *Jackson v. Denno* hearing on its own motion; rather, the onus is on the defendant to challenge the voluntariness of his admissions or confessions and to request the appropriate hearing. Guynes v. State, 92 Nev. 693, 695, 558 P.2d 626, 627 (1976). Appellant's failure to request a voluntariness hearing below precludes appellant consideration of this matter as well. *Id.*

### THE *ALLEN* CHARGE TO THE JURY

After approximately fifteen hours of deliberation over a two day period, the jury informed the trial judge in writing that it could not reach a unanimous verdict because "the evidence is not sufficient to return a verdict of guilty of murder." In the presence of counsel, the court suggested the possibility of giving an *Allen* instruction. *See* Allen v. United States, 164 U.S. 492 (1896). In a reversal of roles, the prosecutor objected to the instruction because of its potential for prejudice; defense counsel emphatically requested that the instruction be given, stating that he had no objections to the instruction as written.

The *Allen* instruction was given to the jury, including the admonition that the jurors "should not surrender [their] honest convictions because of other opinions or for the purpose of returning a verdict." Following six more hours of deliberation, the jury returned the instant guilty verdict. Appellant contends that the giving of the *Allen* instruction was coercive and mandates reversal of his conviction. We cannot agree.

In the past, this Court has reluctantly approved the *Allen* charge if it clearly informs the jury that each member has a duty to adhere conscientiously to his or her own honest opinion, and if it avoids creating the impression that there is anything improper, questionable or contrary to good conscience for a juror to create a mistrial. Ransey v. State, 95 Nev. 364, 366, 594 P.2d 1157, 1158 (1979) (and cases cited therein). The instant jury was so informed. Moreover, the failure to object to the giving of the instruction will ordinarily preclude appellate review. *See* Annot., 100 A.L.R.2d 177, 211 § 8. Here, appellant's counsel adamantly insisted that the instruction be given. Finally, the six hours of jury deliberation following the charge belies the argument that the instruction was unduly coercive in this case. *See* United States v. Beattie, No. 78–2381 (9th Cir., filed Feb. 4, 1980).

We note, however, that the language of the instant instruction, as well as its applicability to this case, approaches the limits of acceptability. In this regard, we adopt the recent comments of Chief Judge Browning, concurring in *U.S. v. Beattie, supra,* slip op. at 1878: "A barely acceptable instruction, once sanctioned, tends to become the new norm. By this process, an instruction of dubious merit continues to deteriorate." To halt this deterioration of the now normative *Allen* charge and to limit the charge's potential for coercion, we hereby expressly approve the American Bar Association's version of the *Allen* charge; the instruction is set out in the margin for the future guidance of our district courts.[2]

---

[2]The approved version of the *Allen* instruction reads as follows:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

"It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own

## THE SUFFICIENCY OF THE EVIDENCE

Finally, appellant contends that the evidence, being circumstantial in nature, was insufficient to support the jury's verdict. We cannot agree.

In reviewing the evidence supporting a jury's verdict, the question is not whether this Court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider. Edwards v. State, 90 Nev. 255, 258–59, 524 P.2d 328, 331 (1974); *see also* Jackson v. Virginia, 443 U.S. 307, 47 U.S.L.W. 4883 (1979). Moreover, a jury may reasonably rely upon circumstantial evidence; to conclude otherwise would mean that a criminal could commit a secret murder, destroy the body of the victim, and escape punishment despite convincing circumstantial evidence against him or her, *see* People v. Scott, 1 Cal.Rptr. 600 (Ct.App. 1959).

Based on the evidence in this case, summarized above, the jury could reasonably have found appellant guilty of second degree murder. The fact of Jo's death was undisputed. The manner in which the body was buried amply supports a finding that death was caused by a criminal agency. The evidence of the custody struggle between appellant and the victim, the fights that had previously transpired, and appellant's dislike of his wife establish appellant's motive for the killing. In addition, appellant's conflicting statements concerning Jo's whereabouts support a finding that appellant had a guilty mind.

---

views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

"You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

ABA Project on Minimum Standards for Criminal Justice, *Standards Relating to Trial by Jury,* Commentary to § 5.4 (1968).

We note that a great number of jurisdictions have recently approved of this instruction. *See* United States v. Angiulo, 485 F.2d 37 (1st Cir. 1973); United States v. Silvern, 484 F.2d 879 (7th Cir. 1973) (en banc); United States v. Thomas, 449 F.2d 1177 (D.C. Cir. 1971) (en banc); United States v. Skillman, 442 F.2d 542 (8th Cir. 1971); United States v. Fioravanti, 412 F.2d 407 (3rd Cir.), *cert. denied sub. nom.* Panaccione v. United States, 396 U.S. 837 (1969); Webb v. United States, 398 F.2d 727 (5th Cir. 1968); People v. Prim, 289 N.E.2d 601 (Ill. 1972); Kelly v. State, 310 A.2d 538 (Md. 1973); Commonwealth v. Rodriguez, 300 N.E.2d 192 (Mass. 1973); Kersey v. State, 525 S.W.2d 139 (Tenn. 1975).

Based on this evidence, the jury could reasonably have found that appellant had intentionally killed Jo, *see* NRS 200.010 and 200.020, but that the murder was committed without premeditation or deliberation, *see* NRS 200.030(1)(a) and (2). Sufficient evidence supports the jury's verdict.

Affirmed.

THOMPSON, GUNDERSON, MANOUKIAN, and BATJER, JJ., concur.