DAN IKIE, Appellant, v. THE STATE
OF NEVADA, Respondent.

No. 21170

December 20, 1991                    823 P.2d 258

*Morgan D. Harris,* Public Defender and *R. Michael Gardner,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, Rose, J.:

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of one count of larceny from the person. The district court sentenced appellant Dan Ikie to a term of ten years in the Nevada State Prison, to run consecutively to a sentence imposed for another conviction.

On November 13, 1989, Alberto Silva was staying at the Sands Hotel in Las Vegas, Nevada. That evening, he left his room with $1,200 in cash in his pocket in a money clip. The cash was in the form of nine one hundred dollar bills and fifteen twenty dollar bills. When Mr. Silva and his wife stopped by a deli in the hotel and read the menu posted on the wall, Mr. Silva noticed a man whom he later identified as Ikie, eating pizza in the deli with a black woman. Mr. Silva also noticed another man in the deli, whom he later identified as Ralph Kado.

Mr. Silva and his wife left the deli and walked down a flight of three stairs. As they descended the stairs, a man whom Mrs. Silva later identified as Kado passed between them. Then, the black woman they had seen in the deli bumped into Mr. Silva from behind. Mr. Silva thought the woman had broken her ankle, and he held her up in an effort to assist her. At that time, he noticed another black man whom he could not identify, standing nearby. The woman quickly recovered her composure and walked away. Mr. Silva testified that Ikie was not present at the time of the incident on the stairs.

Mr. Silva felt there was something wrong. He checked for his money and discovered it was gone. Meanwhile, the black woman was joined by the man Mr. Silva had seen on the stairs, and then by Ikie. As the three walked quickly towards the exit door of the hotel, Mr. Silva called to his wife to get security because he thought he had been robbed, and he began pursuing the three people. After leaving the hotel, the three suspects stopped in a liquor store about one hundred feet away. Mr. Silva saw them exit the store, and he began to chase them. Security guards from the Sands caught up with Mr. Silva, and he pointed out the three suspects. He and the guards followed them across the street towards the Frontier Hotel. When Mr. Silva entered the Frontier, the security guards had both Ikie and Kado in custody. He did not see the woman who had bumped into him.

Marlin Barry Smith, a security officer from the Sands Hotel, testified that when Kado was apprehended at the Frontier Hotel, he had five one hundred dollar bills and either five or six twenty dollar bills in his hand. Officer Stephen Michael Carter of the Las Vegas Metropolitan Police Department testified that he did a pat down search of Ikie, but he found no money. After Carter transported Ikie to the Clark County Detention Center, Ikie was searched again. At that time, one thousand and sixty dollars were found in his shoes. The money was in the form of eight one hundred dollar bills and thirteen twenty dollar bills. An unknown number of five and one dollar bills was also found in Ikie's shoes.

Ikie was arrested and charged by information with larceny from the person, a felony pursuant to NRS 205.270.[1] The information charged both Ikie and Kado with personally taking the money from Mr. Silva's pocket. Specifically, it stated that the larceny was accomplished by:

> [E]ach Defendant aiding and abetting the other and a third unnamed black female, in the following manner, to-wit: by the unnamed black female feigning a fall directly in front of the said ALBERT [sic] SILVA, thereafter Defendants DAN IKIE and/or RALPH KADO bumping ALBERT [sic] SILVA from behind as he went to the aid of the unnamed black female, thereby, causing confusing and allowing Defendants DAN IKIE and/or RALPH KADO to extract lawful money of the United States from the said ALBERTO SILVA'S pocket.

At trial, the facts previously recited were received in evidence and the Silvas confirmed that Ikie was not present when the money was taken. Ikie's attorney moved for dismissal, but the district court denied the motion. The jury returned a verdict of guilty, and the district court sentenced Ikie to ten years in the Nevada State Prison, to run consecutively with the sentence for another conviction.

On appeal, Ikie contends that the prosecutor improperly commented on his post-arrest silence, in violation of the fifth amendment right against self-incrimination and the fourteenth amendment right to a fair and impartial trial. Ikie does not identify the particular testimony or argument he finds objectionable. We have carefully reviewed the record and are unable to

---

[1]NRS 205.270 provides in pertinent part:

1. Every person who, under circumstances not amounting to robbery, with intent to steal or appropriate to his own use, takes from the person of another, without his consent, any money, property or thing of value, shall be punished by imprisonment in the state prison for not less than 1 year nor more than 10 years, and may be further punished by a fine of not more than $10,000.

identify a time at which the prosecutor either improperly elicited comment on Ikie's post-arrest silence or improperly commented on Ikie's post-arrest silence in closing argument. Therefore, we conclude that this argument lacks merit.

Ikie also contends that the district court erred in admitting expert testimony on pickpocket crimes. We conclude, however, that the testimony was properly admitted. *See* Townsend v. State, 103 Nev. 113, 734 P.2d 705 (1987) (threshold test for admissibility of testimony by qualified experts is whether expert's specialized knowledge will assist trier of fact to understand evidence or determine fact in issue).

Next, Ikie argues that the evidence presented at trial was insufficient to support the jury's finding of guilt. We conclude that there was, in fact, insufficient evidence to indicate that Ikie was guilty of taking property "from the person of another" as is required under NRS 205.270. The information alleged that Ikie aided and abetted by taking the money from Mr. Silva. It did not specifically allege that Ikie aided and abetted by any acts prior to or subsequent to the taking. Ikie was not in the vicinity when the woman bumped into Mr. Silva. Only Kado was standing on the stairs nearby, and Ikie did not join Kado and the woman until the woman was away from Mr. Silva and they were exiting the hotel.

The only evidence presented at trial connecting Ikie with the crime is the testimony that he was with the woman before the crime, that he fled the hotel with the other two suspects, and that he was found with one thousand sixty dollars in his shoe. The conviction cannot be buttressed by finding that there is sufficient evidence to prove aiding and abetting in ways other than those charged in the information.

The State is required to set forth in the information or indictment the specific acts constituting the means of aiding and abetting so as to afford the defendant notice to prepare his defense. Barren v. State, 99 Nev. 661, 669 P.2d 725 (1983). In *Barren,* the defendant was convicted for murder, robbery, and burglary. On appeal, he challenged the indictment's sufficiency, arguing that it failed to provide adequate notice of the offenses charged so as to enable him to prepare an adequate defense. On its face, the indictment alleged that the defendant was responsible for the victim's death because he personally struck her, and committed robbery by personally taking property from the person or pres-

ence by force or fear. Despite the wording of the indictment, the State presented little or no evidence that the defendant struck the victim or took property from her presence by force or fear. Instead, the State proceeded primarily on a theory of vicarious liability. After careful consideration of the varying legal views on this subject, we held that:

> [W]here the prosecution seeks to establish a defendant's guilt on a theory of aiding and abetting, the indictment should specifically allege the defendant aided and abetted, and should provide additional information as to the specific acts constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense.

*Id.* at 668, 669 P.2d at 729. *See also* Skinner v. Sheriff, 93 Nev. 340, 566 P.2d 80 (1977) (mere presence does not render defendant guilty of the crime, however reprehensible her conduct was subsequent to the crime).

In the case at bar, the evidence failed to establish the State's theory that Ikie aided and abetted the woman and Kado. In fact, the State disproved the criminal allegations asserted against Ikie when Mr. Silva testified that Ikie was not present when he encountered the woman.

The State might have charged and presented sufficient evidence of receiving stolen property, possession of stolen property, aiding and abetting in larceny from the person, or conspiracy to commit grand larceny. However, these offenses were not charged in the indictment. Ikie was charged with taking property from the victim, but the proof clearly established that Ikie had nothing to do with the specific taking, as he was never near enough to Mr. Silva to take the money from his person, and he took no money from his person.

We hereby reverse the conviction entered against Ikie.

SPRINGER and YOUNG, JJ., concur.

STEFFEN, J., with whom MOWBRAY, C. J., agrees, dissenting:

Unfortunately, the majority has revitalized and extended the meaning of this court's opinion in Barren v. State, 99 Nev. 661, 669 P.2d 725 (1983), far beyond its original intendment in order to invalidate what, in my view, is a sound conviction. I therefore respectfully dissent.

By way of preliminary background, I note that two of the three justices signatory to the majority opinion, including the author thereof, were not members of this court when *Barren* was decided. Although the point has no relevance, I mention it in passing because it may partially explain why the majority has misperceived the special office of the *Barren* ruling. In short,

*Barren* was conceived by this court as a means of restricting outrageous, purposeful prosecutorial misconduct. It was intended from the inception as a ruling with highly limited application.

The youthful defendant, Barren, was befriended by a detective with respect to a comparatively minor matter that was deemed not worthy of prosecution and which, in any event, was unrelated to the murder involved in the *Barren* case. Moved by the fact that the detective seemed genuinely concerned about his life and future, Barren volunteered information to law enforcement officers concerning details of the brutal beating of an elderly victim who died from the assault. At the time of Barren's disclosure, the young man was not under threat of prosecution for any crime, and the police had no suspects concerning the murder. As a result of Barren's unsolicited cooperation, the state obtained detailed information concerning events surrounding the death of the elderly victim, Rose Shapiro, including the very limited and non-violent, non-participatory role of Barren in the killing. Notwithstanding the specific details of the murder thus revealed to the state, the prosecution proceeded to obtain an indictment charging Barren with *personally* beating the victim to death and *personally* and forcefully taking property from her death and *personally* and forcefully taking property from her person or presence. *See, Barren,* 99 Nev. at 665, 669 P.2d at 727. Moreover, despite its knowledge of Barren's true involvement in the crime, the state did not indicate that it might prosecute Barren on an aiding and abetting theory until immediately prior to the opening statements at trial. *See, id.* at 669, 669 P.2d at 730. Finally, the state vacillated during trial as to its theory of prosecution, although the theme of vicarious liability, which was not even mentioned in the indictment, predominated during the course of the prosecution.

Occasionally, there are "unseen hands" that move the judicial pen in response to intolerable circumstances. The *Barren* case constituted an example of an intolerable method of prosecution. It is nevertheless extremely important to understand that *Barren* was fully and purposefully intended to have a severely limited precedential effect. The key to both the scope and thrust of *Barren* is found in footnote 4 of the opinion which qualifies the following holding:

> [W]e now hold that where the prosecution seeks to establish a defendant's guilt on a theory of aiding and abetting, the indictment *should* specifically allege the defendant aided and abetted, and *should* provide additional information as to the specific acts constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense.

*Id.* at 668, 669 P.2d at 729 (emphasis added). The qualifying

footnote appearing at the end of the quoted material revealingly stated: "As pointed out in Simpson v. State, 88 Nev. at 658, n.4, NRS 175.075(2) [an inaccurate reference to NRS 173.075(2) as properly cited in *Simpson*] allows flexibility in pleading *when the evidence is unclear as to the means by which a crime has been committed." Id.* (emphasis supplied).

It was never intended that *Barren* have the effect, or be perceived as having the effect of invalidating NRS 195.020, which, in pertinent part provides:

> Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor is a principal, and shall be proceeded against and punished as such.

At no point in *Barren* did we suggest or infer, let alone hold, that NRS 195.020 is unconstitutional or otherwise infirm and therefore invalid. We did, however, overrule the terse opinion of McWilliams v. State, 87 Nev. 302, 486 P.2d 481 (1971), *to the extent that McWilliams was inconsistent with our ruling in Barren. See, Barren,* 99 Nev. at 668, 669 P.2d at 729. In brief, the rule of *Barren* is that prosecutors do not have the luxury of withholding their true theories of prosecution until trial, thereby deliberately depriving a defendant of the opportunity to most effectively prepare for the primary prosecutive thrust against the defendant. Additionally, *Barren* requires the state to include within the charging document facts by which an aiding and abetting occurred, *if they are known.*

However, as the referenced footnote in *Barren* makes clear, the state is allowed the flexibility of a less particularized pleading under NRS 173.075(2) when the prosecution is uncertain as to the means by which a crime has been committed. It is thus seen that while NRS 195.020 confers upon an aider and abettor the status of a principal, the latter statute does not constitute authority for general or imprecise pleading by the state when details of the means of the commission of the crime are known. The former statute, NRS 173.075(2), does, however, provide the pleading flexibility that the state may utilize in good faith when details, including the precise role of various participants in a criminal enterprise, are unknown.

The majority is therefore in error in concluding that *Barren requires* the state "to set forth in the information or indictment the specific acts constituting the means of aiding and abetting so

as to afford the defendant notice to prepare his defense." If the rule ascribed to *Barren* were that rigid, no validity could be attached to either the qualifying footnote referenced above, or the flexibility expressly provided by NRS 173.075(2). Moreover, under the view expressed by the majority, unless the state can plead the specific acts by which an aiding and abetting is accomplished, no prosecution may proceed. This extreme result was never intended by *Barren* or any other ruling of this court. It is expressly foreclosed by the statutory latitude accorded the state under NRS 173.075(2), a latitude which this court has never declared unconstitutional or invalid in any of its cases, including *Barren.*

Applying the foregoing analysis of *Barren* and its impact on the instant case, I must conclude that the majority has misperceived *Barren* and thus reached an erroneous result. The only evidence that the state possessed was forthrightly presented in the information quoted by the majority. There was no attempt by the state, and indeed the majority has cited to none in the record, to withhold its theory of prosecution until the time of trial. Nor is there evidence that the state, by its information and subsequent prosecution at trial, frustrated or prejudiced Ikie's right to be informed of the charges against him and properly prepare his defense.

The trial record places Ikie in the company of the other two perpetrators immediately preceding and following the consummation of the crime and during the attempted getaway. Expert testimony properly admitted concerning the modus operandi of various pickpocket schemes, revealed that frequently such crimes are committed by a team of three similarly dressed confederates. The first is the "stall," who creates the diversion or bumps into the victim. The second, the "mechanic" or "pick," is the one who actually picks the victim's pocket, and the third, referred to as the "mule," is the confederate who is immediately given the money. A "mule's" role also includes serving as a lookout or a blocker in the event of a chase.

After his apprehension, Ikie was found to be in possession of a large sum of money of the same denomination taken from the victim. The jury reasonably could have concluded that Ikie's possession of the money was consistent with the role assumed by a "mule" as previously described to them by the expert witness.

The jury was free to accept the evidence of record and assign it the weight the jury deemed proper. The totality of the evidence in the instant case, coupled with the guilty verdict, indicate that the jury placed significant credibility in the expert testimony and reached a determination both supportable by the evidence and reasonable in its result. Moreover, based upon the evidence the jury rightfully considered, it is evident that Ikie's participation in

the crime was truly that of a principal, as opposed to either an aider and abettor or a recipient of stolen property. He was part of the "crime team" that acted in concert to complete the crime.

We have long adhered to the principle that "[i]n reviewing the evidence supporting a jury's verdict, the question is not whether this Court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider." Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). I believe that the jury performed its function reasonably and in full accordance with the law as pronounced by this court. Because I do not agree with either the legal analysis or the result of the majority opinion, I am constrained to dissent.