OPINION
 

 Per Curiam:
 

 In July 1996, an elderly man’s severely beaten dead body was found in his home tied up with duct tape. Appellant Michael Joseph Mulder was arrested and convicted of first degree murder, robbery upon a victim over the age of 65, and burglary while in possession of a firearm. He was sentenced to death for the murder conviction.
 

 In his appeal, Mulder challenges the grand jury indictment, claims the district court should have continued his penalty hearing, asserts that certain grand jury testimony should not have been admitted at trial, argues that the district court should have certified his fingerprint witness as an expert, alleges prosecutorial misconduct, and complains that the evidence was insufficient to support his conviction. We conclude that none of Mulder’s contentions have merit. Further, we have reviewed Mulder’s death sentence pursuant to NRS 177.055(2) and conclude that it was not improperly imposed. Accordingly, we affirm Mulder’s conviction and sentence of death.
 

 FACTS
 

 In July 1996, Mulder and his girlfriend, Kimberly Van Heusen, were visiting Las Vegas, Nevada, and were staying at the 49er Motel, near the Showboat Casino. During this time, the couple consumed drugs, and Van Heusen often prostituted herself to obtain money for drugs while Mulder sometimes worked day jobs on construction sites.
 

 On Sunday, July 7, 1996, Van Heusen was gambling at the Showboat Casino when she met seventy-seven-year-old John Ahart in the early afternoon. The two drank, gambled, and spent time together at the Showboat for about two hours. Ahart won $80.00, and they agreed to split the money. Van Heusen and Ahart left the Showboat and went to a restaurant, an ATM machine, and a liquor store before finally arriving at Ahart’s home in a senior citizen mobile home park. There, they continued to drink and spend time together until Ahart drove Van Heusen back to her
 
 *6
 
 motel in his maroon 1990 Infiniti coupe. Because Ahart spent the money he won, he asked Van Heusen to return the next day to receive the $40.00 he owed her.
 

 On Monday, My 8, 1996, Mulder and Van Heusen took the bus to Ahart’s home, arriving about 8 a.m. Ahart let the couple in and gave Mulder a beer and Van Heusen her $40.00. While there, Mulder apparently looked through Ahart’s belongings. At some point, Mulder indicated to Van Heusen that he wanted to return to Ahart’s house “to look around,” which Van Heusen interpreted as Mulder’s intention to steal from Ahart. After approximately one-half hour, Ahart had to leave to do some errands. He gave Mulder and Van Heusen a ride in his Infiniti, dropping Mulder off a short distance from Ahart’s home so he could look for a job and dropping Van Heusen off near her motel.
 

 Approximately an hour and one-half later, Van Heusen was in the motel room when she heard loud honking outside. Mulder was sitting in a maroon 1990 Infiniti coupe with the motor running, honking, and yelling for Van Heusen to grab their stuff and hurry up. Mulder appeared upset and nervous and told Van Heusen that he had stolen the car. Mulder’s right hand was injured, and when Van Heusen asked him how that happened, Mulder replied that he had been in a “struggle.” Van Heusen noticed that Mulder was wearing a new watch and that a wooden jewelry box was in the back seat of the car. Mulder then drove with Van Heusen to Phoenix, Arizona, where his family lived. Mulder later told Van Heusen that he had stolen a gun from the person with whom he had struggled, but had disposed of the gun and had not used it.
 

 On Thursday, July 11, 1996, Mulder and Van Heusen arrived in the Infiniti at the residence of Mulder’s sister, Lisa, who turned them away. They then drove to the house of Mulder’s brother, Craig, who helped Mulder and Van Heusen get a motel room. Craig asked Mulder where he got the Infiniti, and Mulder replied that it was “hot.” When Craig noticed the injury to Mulder’s hand, Mulder replied that he got hurt in a “fight” because “the other guy” owed Van Heusen money and that he had injured his hand on “the other guy’s head.”
 

 Also on July 11, 1996, Jay Ahart, Ahart’s son, arrived at Ahart’s home after receiving a call from Ahart’s neighbor indicating that something was wrong. Jay entered the home through the back door and found his father lying dead in a pool of blood on the dining/living room floor. Ahart’s ankles were bound together and his wrists were tied behind his back with duct tape. A chair had been placed over Ahart’s body in an apparent attempt to conceal it from view. Jay discovered that his father’s gun, watch, jewelry box, and car were missing.
 

 The medical examiner later testified at trial that when discov
 
 *7
 
 ered, Ahart had already been dead for a few days and the body was partially decomposed. Ahart suffered a crushed left cheekbone and several severe scalp lacerations, including a fifteen-inch hinge fracture from the front of the skull extending around back to the base of the skull. The medical examiner also pointed out several fragmentations and depressions around the skull and indicated there was hemorrhaging inside the scalp. The dura mater, a membrane encasing the brain, was torn. Overall, the medical examiner testified that Ahart died from massive head injuries due to severe impact trauma caused by multiple high-force blows from a blunt object.
 

 The police found fingerprints in Ahart’s home belonging to Van Heusen. Also, through a complicated method involving ultraviolet light, the crime scene analysts were able to lift fingerprints off the duct tape used to bind Ahart’s ankles and wrists. The fingerprint expert in Las Vegas determined that those fingerprints did not belong to either Ahart or Van Heusen, but he could neither include nor exclude Mulder as the person who left those prints. After consulting his Las Vegas colleagues, who also could not accurately identify the fingerprints, the fingerprint examiner sent the prints to the FBI fingerprint laboratory.
 

 Robert Witt, the head of the FBI lab, testified as an expert witness that the lab was equipped to identify the most difficult prints in the country and that much of his work was from local police departments whose own experts have little experience in identifying such difficult prints. Witt, who had thirty-five years of fingerprint comparison experience with the FBI, testified that without the use of sophisticated equipment he was able to positively identify the prints from the duct tape as belonging to Mulder. His identification was verified by other FBI fingerprint examiners.
 

 Approximately two weeks after obtaining the Infiniti, Mulder somehow disposed of the car. A short time after that, on August 16, 1996, a man (not Mulder) attempted to register the car in Phoenix. The automobile title examiner verified that this was the same car that was stolen from Ahart, and when she attempted to delay the man from leaving the office, he became nervous and left.
 

 On September 9, 1996, Van Heusen spoke to her mother for the first time since July 1996. After her mother gave her certain information,
 
 [1]
 
 Van Heusen became upset and asked Mulder if he killed Ahart on July 8, 1996. Mulder expressed surprise that Ahart was dead and explained to Van Heusen that he had had to struggle with Ahart because “[Ahart] should have done what he was told.”
 

 
 *8
 
 The Las Vegas police discovered that Mulder and Van Heusen were in Phoenix and arrested them on September 12, 1996. After proceedings before a grand jury in Las Vegas, on October 11, 1996, the state filed an indictment against Mulder for murder, robbery, and burglary. After a trial in February and March 1998, the jury found Mulder guilty of one count each of first degree murder, robbery upon a victim over the age of 65, and burglary while in possession of a firearm.
 

 After the penalty phase, the jury determined that no mitigating factors outweighed the four aggravating circumstances: that the murder was committed (1) while the person was engaged in the commission of or an attempt to commit any burglary; (2) while the person was engaged in the commission of or an attempt to commit any robbery; (3) by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, to wit: bank robbery in Arizona in 1987; and (4) by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, to wit: armed robbery in Arizona in 1980. The special verdict form did not indicate what, if any, mitigating circumstances the jury found. The jury returned a verdict for the death sentence. The district court sentenced Mulder to serve two consecutive terms in prison of 48 to 180 months for robbery and a consecutive term of 40 to 180 months for burglary. This appeal follows.
 

 DISCUSSION
 

 I.
 
 The presence of two homicide detectives during Van Heusen’s grand jury testimony
 

 Because Van Heusen was reluctant to testify against Mulder, she was arrested as a material prosecution witness. Pursuant to the prosecutor’s request, the grand jury granted permission for two homicide detectives to be present while Van Heusen testified in front of the grand jury. For the first time on appeal, Mulder challenges the indictment, contending that the officers’ presence intimidated Van Heusen while she testified against Mulder. Specifically, Mulder claims that their presence violated NRS 172.235(1), limiting the people who may be present'during the grand jury proceedings.
 

 Mulder failed to raise this issue in the district court below, and therefore, we need not consider it.
 
 See
 
 Walch v. State, 112 Nev. 25, 34, 909 P.2d 1184, 1189 (1996). We note, however, that no violation occurred. NRS 172.235(1)(g) permits “[a]ny other per
 
 *9
 
 son requested by the grand jury to be present” at grand jury proceedings. The grand jury’s permission for the detectives’ presence falls into this category.
 
 See
 
 Lujan v. State, 85 Nev. 16, 18-19, 449 P.2d 244, 245 (1969) (holding that under former NRS 172.320, because the grand jury may request the presence of any person, the grand jury’s permission was sufficient and no violation occurred).
 

 EL.
 
 Mulder’s pretrial motion to continue the penalty phase
 

 On October 17, 1997, approximately four months prior to trial, Mulder’s attorneys moved the district court to “bifurcate” the guilt phase from the penalty phase. Specifically, counsel requested that any necessary penalty hearing be held at least sixty days after the conclusion of the guilt phase. This request was based on Mulder’s apparent refusal to assist his counsel in obtaining mitigating evidence in preparation for a possible penalty hearing. Therefore, counsel wanted the two-month delay so they could thoroughly investigate mitigating evidence if Mulder was found guilty. On November 7, 1997, the district court denied the motion. Mulder now contends the court’s ruling was an abuse of discretion.
 

 NRS 175.552(l)(a) requires that in the event of a first degree murder verdict, the separate penalty phase be conducted in front of the trial jury “as soon as practicable.” It is well settled that granting or denying a motion for a continuance is within the sound discretion of the district court. Batson v. State, 113 Nev. 669, 674, 941 P.2d 478, 482 (1997). We conclude that the court did not abuse its discretion in denying Mulder’s pretrial request to delay the penalty hearing by sixty days.
 

 In Lord v. State, 107 Nev. 28, 41, 806 P.2d 548, 556 (1991), after the defendant was found guilty of first degree murder, he requested the district court to grant him a half-day continuance for the penalty phase to permit his witnesses to travel to Nevada to testify. The district court denied the request, and the defendant was prevented from presenting six of his seven witnesses, including his father.
 

 On appeal, this court balanced the prejudice to the district court of a continuance against the prejudice to the defendant of no continuance and concluded that the district court abused its discretion by “refusing to grant this
 
 reasonable
 
 request for a
 
 modest
 
 continuance.”
 
 Id.
 
 at 42, 806 P.2d at 556-57 (emphasis added). This court held that denying a reasonable continuance may be an abuse of discretion “where the purpose of the motion is to procure
 
 *10
 
 important witnesses and the delay is not the particular fault of counsel or the parties.”
 
 Id.
 
 at 42, 806 P.2d at 557.
 

 First, in this case, the request was for sixty days, as opposed to a half day in
 
 Lord.
 
 Therefore, we conclude that the request was not for a ‘ ‘modest’ ’ continuance. Second, the alleged need for the sixty-day delay was entirely attributable to Mulder, who refused to assist his attorneys in preparation for a potential penalty hearing. Accordingly, “the delay [was] the particular fault of [Mulder].”
 
 See id.
 
 Third, although the purpose of Mulder’s motion to continue was to procure important mitigating evidence in the event of a penalty hearing, Mulder has failed to explain exactly what mitigating evidence was not presented due to the court’s refusal to continue the penalty hearing. In fact, Mulder presented testimony of three witnesses who provided mitigating evidence and was not prevented from presenting additional witnesses. Therefore, Mulder suffered no prejudice by the lack of a continuance. Accordingly, we conclude that the district court did not abuse its discretion by denying Mulder’s motion to continue the penalty phase.
 

 III.
 
 Admission of Van Heusen’s grand jury testimony
 

 During Van Heusen’s testimony at trial, the prosecutor requested that Van Heusen read some of her grand jury testimony to herself. Immediately afterward, the following exchange occurred:
 

 [PROSECUTOR]: Okay. Do you recall what you told the grand jury regarding a conversation you had with [Mulder] about his going back to the trailer?
 

 Why don’t you read what you said. Read my questions and the answers.
 

 [VAN HEUSEN]: Okay. . . .
 

 [DEFENSE COUNSEL]: I object to her reading the grand jury transcript.
 

 THE COURT: You have to read it, Mr. Schwartz [the prosecutor]. Ask her if that’s the answers.
 

 Q. (By Mr. Schwartz) Prior to—my question I asked you “prior to leaving Mr. Ahart’s home did [Mulder] say anything to you about coming back to the home[?]”
 

 [DEFENSE COUNSEL]: We would object to it as hearsay.
 

 THE COURT: Overruled.
 

 Q. (By Mr. Schwartz) What did he say?
 

 “Answer: He said that he’s going to come back and look around and see if, you know, he can’t get some things.
 

 
 *11
 
 ‘ ‘ What did that lead you to think he was going to do?
 

 “Answer: I thought he maybe wanted to go over there and steal something.”
 

 Was that your testimony before the Clark County Grand Jury? Was that your testimony at that time?
 

 A. Yes.
 

 Mulder argues that the grand jury testimony was hearsay and the district court erroneously overruled his objection without explanation. In his opening brief, Mulder points out that the “refresh recollection exception,” NRS 50.125, did not apply because the prosecutor failed to establish the need to refresh Van Heusen’s recollection. He further contends that the grand jury testimony could not be admitted as a prior inconsistent statement pursuant to NRS 51.035(2)(a) because the prosecutor failed to establish that the statement was inconsistent with Van Heusen’s trial testimony.
 

 We note, however, that “[a] transcript of testimony given under oath at a trial or hearing or
 
 before a grand jury”
 
 is not considered hearsay if the declarant testifies at trial and is subject to cross-examination. NRS 51.035(2)(d) (emphasis added);
 
 see also
 
 California v. Green, 399 U.S. 149, 159 (1970) (“[T]he inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial.”); Maginnis v. State, 93 Nev. 173, 175-76, 561 P.2d 922, 923 (1977) (concluding that admission of a witness’s grand jury testimony was not error). Here, Van Heusen testified at trial and was subject to cross-examination. Accordingly, admission of her grand jury testimony was not hearsay and was therefore properly admitted.
 

 IV.
 
 Testimony of Mulder’s witness on fingerprint comparison
 

 To rebut the state’s evidence that Mulder’s fingerprints were found on the duct tape used to restrain Ahart, Mulder presented as a witness Howard Doulder, an alleged expert in fingerprint comparison. As his credentials, Doulder testified that in 1947 he joined the Milwaukee Police Department and was trained in analyzing fingerprints. From 1955 through 1973, he worked as the United States Treasury Department’s laboratory supervisor. He explained that he reviewed what is known as “questioned documents” and to a lesser degree fingerprints for many of the United States agencies, such as the Internal Revenue Service, Alcohol, Tobacco and Firearms, Immigration and Naturalization Service,
 
 *12
 
 Secret Service, and Customs. Eventually, Doulder moved to Orange County, California, and then to Las Vegas, Nevada, where he worked as a private consultant examining questioned documents and to a lesser extent fingerprints. He claimed that he had testified in Nevada as an expert on many occasions, but only a small percentage of his testimony regarded fingerprints. Additionally, he testified that he was an active life member of the International Association for Identification (IAI).
 

 During the prosecutor’s voir dire examination, Doulder revealed that the IAI listed him as an expert in questioned documents, not fingerprints. Doulder was listed as an IAI fingerprint expert in 1950; although he is no longer listed, he testified, “Fingerprints haven’t changed from 1950 to now. They are the same.” Additionally, the prosecutor elicited testimony that although Doulder had testified about fingerprinting in recent trials in Las Vegas, the presiding judges in those trials refused to determine that he was a qualified fingerprint expert. Doulder admitted that ninety percent of his work is in questioned documents and only ten percent deals with fingerprints.
 

 Even before the prosecutor finished his voir dire examination, the district court ruled that Doulder was not a qualified expert in fingerprint comparison, but would nevertheless be permitted to testify. Doulder then testified that he compared the fingerprints found on the duct tape with Mulder’s known prints and was unable to find enough points of comparison to identify the prints as belonging to Mulder. Doulder, however, did not conclude that the prints were conclusively not Mulder’s.
 

 On appeal, Mulder argues that although Doulder testified about the fingerprints, the district court erred by refusing to recognize Doulder as an expert. Mulder’s argument emphasizes that the evidence that Mulder’s fingerprints matched those on the duct tape was key evidence in connecting Mulder to this crime. He asserts that had the court determined that Doulder was a qualified expert, “his testimony could have induced reasonable doubt in the minds of the jurors.”
 

 NRS 50.275 provides: “If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness
 
 qualified as an expert
 
 by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.’ ’ (Emphasis added.)
 

 Whether expert testimony will be admitted, as well as whether a witness is qualified to be an expert, is within the district court’s discretion, and this court will not disturb that decision absent a
 
 *13
 
 clear abuse of discretion.
 
 See
 
 Smith v. State, 100 Nev. 570, 572, 688 P.2d 326, 327 (1984); Childers v. State, 100 Nev. 280, 283, 680 P.2d 598, 600 (1984). This court has reasoned that:
 

 The district court is better suited to rule on the qualifications of persons presented as expert witnesses and we will not substitute our evaluation of a witness’s credentials for that of the district court absent a showing of clear error.
 

 Hanneman v. Downer, 110 Nev. 167, 179, 871 P.2d 279, 287 (1994).
 

 Clearly, before a witness may testify as to his or her expert opinion, the district court must first determine that the witness is indeed a qualified expert.
 
 See, e.g.,
 
 Fernandez v. Admirand, 108 Nev. 963, 969, 843 P.2d 354, 358 (1992) (stating that once a witness is qualified as an expert, he or she may testify to all matters within his or her experience or training); Houston Exploration v. Meredith, 102 Nev. 510, 513, 728 P.2d 437, 439 (1986) (indicating that the proffered expert testimony may be admitted only after the witness is qualified as an expert). When making this decision, the court should refrain from making comments which would demean the credibility and expertise of the witness.
 
 See
 
 Wickliffe v. Sunrise Hospital, 104 Nev.
 
 777,
 
 780, 766 P.2d 1322, 1324 (1988). It is a function of the jury, not the court, to determine the weight and credibility to give such testimony. Bolin v. State, 114 Nev. 503, 525-26, 960 P.2d 784, 799 (1998),
 
 cert. denied,
 
 525 U.S. 1179, 119 S. Ct. 1117 (1999).
 
 [2]
 

 In the present matter, we first conclude that the district court did not abuse its discretion by determining that Doulder was not a qualified expert in fingerprint comparison. The court heard the voir dire examination by the prosecutor and was in the best position to determine whether Doulder’s credentials qualified him as an expert on this subject. Doulder’s voir dire testimony revealed that he in fact had little, or at least questionable, expertise in that area; rather, it appears that his expertise lay mostly in examining questioned documents, using skills such as handwriting analysis. While the court did not err by failing to qualify Doulder as an expert, it did, however, err by permitting him to testify.
 

 
 *14
 
 Although NRS 50.265 permits the presentation of lay opinion testimony, it is clear in this case that the court permitted Doulder to testify as if he were an expert even after the court concluded he was not an expert. If the court believed that Doulder was an expert, then it demeaned his credibility and expertise by announcing in front of the jury that Doulder was not an expert.
 
 See Wickliffe,
 
 104 Nev. at 780, 766 P.2d at 1324. If, however, the court did not believe that Doulder was an expert, then the crucial requirement of being a qualified expert was not fulfilled, and therefore, Doulder should not have testified at all.
 
 See
 
 NRS 50.275. In this case, the court specifically concluded that Doulder was not an expert; accordingly, the court erred by permitting him to testify as to his “expert” opinion.
 

 We hold that if a witness fails to qualify as an expert, the court should not permit the witness to testify unless the witness may otherwise be considered a lay witness. Here, Doulder was not a lay witness and should not have been permitted to testify. The error here was clearly harmless as it favored the defense; reversal is not warranted.
 

 V.
 
 Prosecutorial misconduct regarding Mulder’s witness on fingerprint comparison
 

 Mulder argues that the prosecutor committed misconduct by disparaging Doulder during voir dire examination and closing arguments. Mulder first argues that the prosecutor conducted an “improper voir dire . . . despite the lengthy and material qualifications of [Doulder].” Mulder contends that the prosecutor “ambushed” Doulder during the voir dire examination and should have shown “restraint.” After reviewing the voir dire testimony, we conclude that the state’s voir dire examination was proper.
 

 The prosecutor’s questions clearly concerned Doulder’s qualifications, serving the very purpose of voir dire examination of an alleged expert witness. We conclude that a district court
 
 should
 
 hear such information before deciding whether to qualify someone as an expert. Mulder appears to argue that just because he presented Doulder as an expert and because Doulder has some qualifications relating to fingerprints, the court should have automatically qualified him as a fingerprint expert and dispensed with any voir dire examination. As discussed above, the court did not abuse its discretion by refusing to determine that Doulder was a qualified expert.
 

 Mulder next argues that the prosecutor committed misconduct
 
 *15
 
 during closing arguments of the guilt phase by stating: “We have had experts, two experts testify at this trial with all due respect and Judge Pavlikowski agreed Dr. Doulder was no expert.” Mulder failed to object to this comment, and we will therefore not consider this argument because it is neither plain nor patently prejudicial error.
 
 See
 
 Hewitt v. State, 113 Nev. 387, 392, 936 P.2d 330, 333 (1997).
 

 VI.
 
 Sufficiency of the evidence
 

 To sustain a conviction, sufficient evidence must exist that establishes guilt beyond a reasonable doubt as determined by a rational trier of fact. Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). The trier of fact determines the weight and credibility to give conflicting testimony, and on appeal this court will not disturb a verdict which is supported by sufficient evidence. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). We conclude sufficient evidence supports Mulder’s conviction for first degree murder, robbery upon a victim over 65 years of age, and burglary while in possession of a firearm.
 

 First degree murder
 

 Mulder argues that the evidence presented failed to demonstrate that he committed Ahart’s murder willfully, deliberately, and with premeditation. Evidence of premeditation and deliberation is usually indirect, and circumstantial evidence may constitute sufficient evidence. Briano v. State, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978). We conclude that the evidence was sufficient for the jury to reasonably find that Mulder weighed the consequences of killing Ahart, distinctly and rationally formed a design to kill, and did not act simply from a rash unconsidered impulse.
 

 Mulder indicated to Van Heusen that he planned on returning to Ahart’s home. Ahart’s dead body was found hog-tied, and Mulder’s fingerprints were found on the duct tape used to tie Ahart. The medical examiner testified that Ahart probably died around July 8, 1996, the day Mulder went back to Ahart’s house, and that Ahart died from severe impact trauma to his head. Mulder made statements that he was involved in a struggle with a man he was robbing, and Mulder told Van Heusen that Ahart “should have done what he was told.” Mulder was seen with the items stolen from Ahart, and Mulder was very anxious to leave town right after returning from Ahart’s house.
 

 
 *16
 

 Robbery upon a victim over the age of 65
 

 Mulder claims that because he was not found with the stolen items in his possession, there was unreliable evidence that he robbed Ahart. We conclude there was sufficient evidence that he possessed the items. Much testimony was presented that other people saw Mulder with Ahart’s car, watch, and jewelry box, and Van Heusen testified that Mulder told her that he also took Ahart’s gun.
 

 Mulder further claims that the state failed to prove that Ahart was alive when Mulder committed the taking. He argues therefore that because violence is a requirement for robbery, there was insufficient evidence to convict him of robbery. We conclude this argument is patently without merit. Ahart suffered from severe blows to the head, resulting in his death. We conclude that violence was indeed used during the commission of the taking, whether the taking occurred before or after Ahart succumbed to his injuries.
 
 See
 
 NRS 200.380(1) (defining robbery in part as “the unlawful taking ... by means of force or violence”).
 

 We also note that evidence was presented that Mulder intended to return to Ahart’s residence in order to steal and that he “struggled” with Ahart due to Ahart’s lack of cooperation. Accordingly, we conclude sufficient evidence exists to support Mulder’s conviction for robbery.
 

 Burglary while in possession of a firearm
 

 Mulder alleges that the state failed to prove that he had the requisite intent to commit a felony when he entered Ahart’s home. We conclude this argument has no merit. Again, evidence was presented that Mulder intended to return to Ahart’s residence to steal. Mulder further argues that there was no evidence to verify that there was a gun of which Mulder took possession in Ahart’s home. However, Mulder’s own admissions, presented through Van Heusen’s testimony, belie this claim. Mulder told Van Heusen that he took the gun, but later disposed of it because he knew it would upset Van Heusen. Accordingly, we conclude sufficient evidence supports Mulder’s conviction of burglary while in possession of a firearm.
 

 VII.
 
 Cumulative error
 

 Mulder contends that the cumulative effect of the previously discussed alleged errors denied him a fair trial.
 
 See
 
 Big Pond v.
 
 *17
 
 State, 101 Nev. 1, 692 P.2d 1288 (1985). Relevant factors to consider in evaluating a claim of cumulative error are (1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged. Leonard v. State, 114 Nev. 1196, 1216, 969 P.2d 288, 301 (1998). In this case, we conclude Mulder has failed to demonstrate any error detrimental to him.
 

 VIH.
 
 This court’s mandatory review pursuant to NRS 177.055(2)
 

 NRS 177.055(2) requires this court to determine whether the evidence supports the aggravating circumstances, whether the verdict of death was imposed under the influence of passion, prejudice, or any arbitrary factor, and whether the death sentence is excessive considering this defendant and this crime.
 

 First, we conclude that sufficient evidence exists to support the aggravating circumstances: (1) Mulder committed the murder while committing a burglary; (2) Mulder committed the murder while committing a robbery; (3) Mulder was previously convicted of bank robbery in Arizona in 1987; and (4) Mulder was previously convicted of armed robbery in Arizona in 1980. The jury already determined beyond a reasonable doubt that Mulder committed both the burglary and the robbery, and as discussed above, sufficient evidence supports those convictions.
 

 In support of the 1987 bank robbery conviction, the state presented the testimony of the bank teller who was robbed on October 20, 1986. She, however, did not identify Mulder as the assailant. An Arizona police officer testified that on December 15, 1986, Mulder turned himself in for the bank robbery. Mulder’s April 13, 1987 judgment of conviction for bank robbery was admitted into evidence; Mulder had been sentenced to serve seven years in federal prison.
 

 In support of the 1980 armed robbery conviction, the state presented the testimony of another Arizona police officer who testified that on March 15, 1980, Mulder robbed a sixteen-year-old cashier at a Taco Bell and on April 21, 1980, Mulder robbed an employee of Church’s Chicken. The officer testified that both victims had identified Mulder as the perpetrator and Mulder eventually pleaded guilty to one count of armed robbery. Mulder’s July 17, 1980 judgment of conviction for armed robbery was admitted into evidence; Mulder had been sentenced to serve seven years in
 
 *18
 
 prison. We conclude that sufficient evidence exists to support the aggravating factors.
 

 Next, we conclude that the death sentence is neither excessive nor imposed under the influence of passion, prejudice, or any arbitrary factor. The state presented evidence of Mulder’s many other prior convictions, both as an adult and as a juvenile, for forgery, car theft, burglary, malicious mischief, theft, and trespass. Mulder also had his probation revoked and has violated parole. The state also presented victim impact testimony from Ahart’s nephew and son (who had found Ahart’s body). The jury also considered the facts of this crime, presented during the guilt phase.
 

 In mitigation, Mulder presented the rather compelling testimony of a psychologist, Van Heusen, and a priest. The psychologist testified as to Mulder’s history of drug use, bad childhood, fragile self-concept and low self-esteem, and impulse control disorder. Van Heusen, who specifically requested to testify on Mulder’s behalf in the penalty phase, testified that Mulder was generally nonviolent and was a good person who wanted to do the right thing. She explained that she loved him very much and that he was the father of her child. The priest, who had known Mulder for approximately nine years, testified that Mulder was a gentle and sensitive person and a good friend. Additionally, Mulder presented testimony that despite his strenuous efforts, his family refused to support him or help challenge the death penalty.
 

 In this case, Mulder committed a particularly violent and gruesome crime by tying up and then beating an elderly man to death. Mulder has an extensive criminal record, and over time, he appeared to commit crimes increasing in violence, culminating in this murder. We conclude that considering this crime and Mulder’s background, the death sentence is not excessive, nor was it imposed pursuant to any inappropriate factor.
 

 CONCLUSION
 

 We conclude that none of Mulder’s issues require reversal. We further conclude that the death sentence is not inappropriate pursuant to NRS 177.055(2). Accordingly, we affirm Mulder’s conviction and sentence of death.
 

 [1]
 

 Because it was hearsay, Van Heusen did not testify as to exactly what her mother told her.
 

 [2]
 

 In ruling on whether or not a witness may testify as an expert, the court must take care not to use terms such as “qualified as an expert” or “certified as an expert” when referring to the witness in the presence of the jury. The court should simply state that “the witness may testify,” or sustain any objection to a request to permit the witness to testify as an expert. This will prevent potential prejudice by either demeaning or promoting the credibility of the witness.